244 F.3d 758 (9th Cir. 2001)
 ADRIAN LAMONT DILLARD, Petitioner-Appellee,
v.
ERNIE ROE, Warden;ATTORNEY GENERALOF THE STATEOF CALIFORNIA, Respondents-Appellants.
ADRIAN LAMONT DILLARD, Petitioner-Appellant,
v.
ERNIE ROE, Warden;ATTORNEY GENERALOF THE STATEOF CALIFORNIA, Respondents-Appellees.
 No. 99-56345, 99-56376
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted February 7, 2001
Filed March 27, 2001
Amended May 17, 2001
 
 [Copyrighted Material Omitted]
 Peter H. Gold, Berkeley, California, attorney for the petitioner-appellee/cross-appellant.
 Jeffrey B. Kahan, Deputy Attorney General, Los Angeles, California, attorney for the respondents-appellants/crossappellees.
 Appeal from the United States District Court for the Central District of California Ronald S.W. Lew, District Judge, Presiding, D.C. No.CV-98-09773-RSWL D.C. No.CV-98-09773-RSWL
 Before: Harry Pregerson, William C. Canby, Jr., and David R. Thompson, Circuit Judges.
 PREGERSON, Circuit Judge:
 
 
 1
 This federal habeas case raises issues concerning the admissibility of expert testimony on battered women's syndrome and the proper procedure for taking judicial notice of a defendant's prior felony convictions. This case also involves a challenge to the constitutionality of two five-year sentence enhancements.
 
 
 2
 California prisoner Adrian Lamont Dillard filed a 28 U.S.C. S 2254 petition in federal district court raising constitutional challenges to his state court conviction and sentence. Dillard was convicted of one felony count of inflicting corporal injury upon a cohabitant, in violation of California Penal Code S 273.5(a). The state trial court sentenced Dillard to twenty-five years to life in prison. In addition, the court imposed two five-year sentence enhancements.
 
 
 3
 The federal district court issued an order granting in part and denying in part the relief requested in Dillard's S 2254 petition. The State appeals the portion of the district court's order granting relief. Dillard cross appeals the portion of the district court's order denying relief.
 
 
 4
 We have jurisdiction pursuant to 28 U.S.C. S 1291, and we affirm the district court's order in its entirety.
 
 FACTS and PROCEDURAL HISTORY
 
 5
 The crime occurred on March 13, 1994.[1] At about 8:00 p.m. that evening, the victim, Dillard's girlfriend Stephanie Rick, was sitting on the porch of the house that she shared with Dillard. Dillard was not at home. Two men unknown to Stephanie Rick approached her and spoke to her in Spanish. One of the men touched her leg. At that moment, Dillard drove up to the house in his car. An argument ensued, during which Dillard beat Rick, injuring her.
 
 
 6
 In an information filed on March 31, 1994, Dillard was charged with: (1) one felony count of willful infliction of corporal injury upon a cohabitant, in violation of California Penal Code S 273.5(a); and (2) two felony counts of assault with a firearm, in violation of California Penal Code S 245(a)(2). The information also charged Dillard with having been "duly and legally convicted" of two prior felonies: a robbery, committed on January 4, 1989, in violation of California Penal Code S 211, and an assault with intent to commit rape, committed on January 12, 1990, in violation of California Penal Code S 220.
 
 
 7
 The state trial court dismissed the two felony counts of assault with a firearm after defense counsel argued that those charges were unsupported by "credible evidence. " The court "sustain[ed]" the counts in the information that Dillard had: (1) inflicted corporal injury upon a cohabitant; and (2) suffered two prior felony convictions.
 
 
 8
 At the state court trial, Stephanie Rick's friend, Kimberly Frazier, testified for the prosecution. Frazier stated that she received a phone call from Rick on March 16, three days after the incident on the porch. During the telephone conversation, Rick told Frazier that Dillard had beaten her up. Later that same day, Rick went over to Frazier's house, and Frazier observed that she had two black eyes, a cut lip, a swollen jaw, and two bruises. After speaking with Rick, Frazier called the police and told Detective Donald Mauk that Rick had been beaten by her boyfriend, Dillard.
 
 
 9
 Detective Mauk testified for the prosecution. He stated that he received a phone call from Kimberly Frazier on March 16, in which she reported the incident between Stephanie Rickand Dillard. That same day, Mauk interviewed Rick. Mauk testified that Rick gave him the following account of the incident. On the night of March 13, Rick was standing on the porch with two men, and Dillard witnessed one of the men touch her leg. Dillard then pulled out his handgun and fired one shot into the air. The men ran off, and Dillard and Rick went inside the house. Dillard then fired three shots from a handgun into the floor between Rick's feet and punched her in the mouth.
 
 
 10
 Stephanie Rick told Detective Mauk that after Dillard hit her, she walked to the home of a relative, Keith Royal, and told him that Dillard had hit her. Royal told Rick she could stay at his house, and she went home to get her children. When Rick returned to her house, Dillard punched her in the face, head, and upper body, and attempted to choke her.
 
 
 11
 On March 17, the day after Detective Mauk interviewed Stephanie Rick, he went to Rick and Dillard's home to search for the bullet holes. Mauk stated that he found three holes in the carpet between the coffee table and the front door that "could be consistent with somebody firing [a ] handgun directly down into the floor." On cross examination, Mauk acknowledged that there was no sign of "powder burns or stippling of any sort around the carpet area where the bullet holes were."
 
 
 12
 Stephanie Rick also testified at trial. Her account differed dramatically from the account provided by Kimberly Frazier and Detective Mauk. Rick testified that on the night of March 13, Dillard arrived home and saw a man touching her leg. She said that Dillard was upset and that she argued with him. Rick testified that she got "in [Dillard's] face," and that he responded by pushing her away, which caused her to fall and cut her lip. Rick stated that she then went to Royal's house and told him that she had fought with Dillard. She denied telling Royal that Dillard punched her. She also denied that she told anyone that Dillard had pulled out a gun and fired one shot in the air, or that he had fired any shots between her feet.
 
 
 13
 Rick testified that she left Royal's house, returned home to get her children, and that she and Dillard resumed arguing. Rick further testified that during the argument, she punched Dillard in the eye, kicked him in the groin, and tried to run out the back door. Rick also testified that during the argument, she fell down and hit her face on the stove, and that afterwards, she went alone into the bedroom and gave herself two black eyes by "socking myself in the face." In response to the prosecutor's repeated questions as to how she sustained the other bruises on her body, Rick repeatedly answered,"I don't remember" and "I don't know."
 
 
 14
 Confronted with the inconsistencies between her courtroom testimony and her statements to Detective Mauk and Kimberly Frazier, Rick testified that her statements to Mauk and Frazier were lies. She stated that she was afraid that if Mauk discovered that she had punched and kicked Dillard, she might go to jail and lose her children. Rick testified that she lied to Frazier because she wanted her sympathy and felt stupid explaining that her injuries were self-inflicted.
 
 
 15
 Over a defense objection, the prosecution called Gail Pincus, a licensed clinical social worker and the director of a center for victims of domestic violence, to testify in general terms about Battered Women's Syndrome ("BWS"). BWS is defined as "a series of common characteristics that appear in women who are abused physically and psychologically over an extended period of time by the dominant male figure in their lives." People v. Humphrey, 13 Cal.4th 1073, 1083-84 (1996).
 
 
 16
 Before trial, the defense moved in limine to have Pincus's testimony excluded. Defense counsel argued: "this jury is going to hear from an expert who is going to talk about battered woman's syndrome. There is a woman with bruises in this case. This jury is going to assume, therefore, that if this expert is getting up and talking about [BWS] this woman must have it, and that . . . has not been established."
 
 
 17
 Before denying the motion, the court stated:
 
 
 18
 [t]he alleged victim in this case has recanted and everybody seems to agree that that's the case that she recanted on her earlier statement. And the [BWS] evidence would be admissible to allow the jury to better judge the credibility of the victim and not whether or not the act did or did not occur.
 
 
 19
 Gail Pincus testified in general terms about the symptoms, cycles, and personality types associated with BWS. She did not examine Stephanie Rick, nor did she testify that she believed that Rick suffered from BWS. Pincus explained that BWS generally develops in three stages: (1) the tension rising phase; (2) the violence phase; and (3) the honeymoon phase. In the tension rising phase, a man and woman meet and quickly become involved in an intense romantic relationship. The relationship, which is initially a happy one, deteriorates slowly as the man becomes increasingly possessive of and angry with the woman.
 
 
 20
 Pincus testified that the tension rising phase eventually gives way to outright violence. In this phase, she explained,the man loses control and lashes out at the woman by "pushing and shoving, slapping, hair pulling," and "actual beatings, multiple blows, threatening with knives and guns. " After the violent episode, Pincus explained, the man is scared that the woman will tell the police or decide to leave him. He tells the woman that he loves her and minimizes the seriousness of his violent outburst by telling her that she is partially responsible. Pincus testified that "this cycle continues in frequency and severity over time."
 
 
 21
 Pincus also testified that the common response of women in BWS relationships is "to humanize [the batterer]," believing that "her safety lies with [him], and that we all here in this courtroom are the enemy." Pincus testified that this behavior causes the battered woman to believe "it is her duty to make [the police, the prosecutors, the judges] all disappear" so that she and the batterer can resume their relationship. Pincus explained that as a result, "it's very common " for battered women to recant their allegations of abuse.
 
 
 22
 Defense counsel asked the court to appoint rebuttal experts. Initially, defense counsel requested the appointment of a pharmacologist and a psychiatrist. But, at the hearing held by the court on September 12, 1994, counsel changed his mind because he thought the testimony of the two experts would be "duplicat[ive]." Defense counsel asked only that the court pay for the testimony of Dr. Jacqueline Green, a psychiatrist who had treated Stephanie Rick in the months before and after she was allegedly beaten by Dillard. The court agreed.
 
 
 23
 Dr. Green testified that, three months after the incident, she had a therapy session with Rick during which Rick told her that Dillard had not beaten her on the night of March 13, 1994. Dr. Green testified that she believed Rick. On cross examination, Dr. Green acknowledged that, during the therapy session, Rick did not tell her that she had sustained two black eyes or inflicted injuries on herself on that evening. Dr. Green acknowledged that, had she known of these facts, she would have "asked [Stephanie Rick] more questions" about the incident. Dr. Green also stated that, while she had seen "a couple" of women with BWS in her practice, she had no formal training in diagnosing and treating BWS.
 
 
 24
 During her closing argument, the prosecutor stated that "domestic violence is a very difficult crime to prosecute . . . one of the reasons being that it's very common for victims to recant, to blame themselves, and to say that nothing happened, and to not want to prosecute."
 
 
 25
 The prosecutor went on to characterize Stephanie Rick as precisely this type of victim by arguing that her "unreasonable and incredible" testimony was a recantation motivated byself-blame and her love for Dillard. The prosecutor noted that Rick had a motive to recant her accusations because she had married Dillard after the incident.[2] The prosecutor referred to Pincus's expert testimony to underscore that Rick's behavior "is very common among women who have been battered." The prosecutor continued, "I am not going to argue with you, you know, that [Stephanie Rick] is definitely someone within the [BWS] cycle, but I will argue to you that she is someone who was battered."
 
 
 26
 The prosecutor also told the jury that the state was not attempting to prove that Dillard had "personally use[d] a firearm" during his battery of Rick. She stated:"[Dillard] is not charged with firing between [Rick's] legs. There is no evidence that any bullets were recovered, and I am not trying to imply by anything that I have said or done that there was any such evidence."
 
 
 27
 Before the jury began deliberations, the prosecutor asked the trial judge to take judicial notice of two Los Angeles County Superior Court criminal case files. These files contained documents showing that a person named Adrian Lamont Dillard had been convicted of two prior serious felonies. The court agreed to take judicial notice of the files and instructed the jury that "you must find to be true what the records indicate." The court then stated that the court files "reflect[ ] that a individual named Adrian Lamont Dillard" had been convicted previously of two serious felonies: robbery and assault with intent to commit rape.
 
 
 28
 On October 12, 1994, the jury convicted Dillard of one felony count of inflicting corporal injury upon Stephanie Rick in violation of California Penal Code S 273.5(a). The jury also filled out two special verdict forms. These forms stated that the jury found to be "true" that Dillard previously had been convicted of robbery and assault with intent to commit rape, and that those crimes constituted two prior felonies "within the meaning of" California Penal Code S 667.[3] The trial judge then sentenced Dillard, as a "three strikes" offender, to a term of twenty-five years to life in prison. The court did not impose any sentence enhancements.
 
 
 29
 Dillard appealed to the California Court of Appeal for the Second District. On May 30, 1996, in an opinion that the California Supreme Court subsequently ordered depublished, the California Court of Appeal affirmed Dillard's conviction and "ordered" the trial judge to resentence him. The state appellate court concluded that, because Dillard's conviction was "a serious felony" and Dillard "previously [had] been convicted of a serious felony," the trial judge was required to enhance Dillard's sentence by imposing "a five year enhancement for each [serious] prior conviction" pursuant to California Penal Code 667(a)(1).[4]
 
 
 30
 Dillard petitioned for review in the California Supreme Court. On June 20, 1996, the California Supreme Court denied the petition. On remand, the trial court imposed the two five-year sentence enhancements, which the appellate court affirmed. On July 16, 1996, the California Supreme Court again denied review.
 
 
 31
 Pursuant to 28 U.S.C. S 2254, Dillard filed a habeas corpus petition in federal district court on January 4, 1999. The Magistrate Judge issued a Report and Recommendation ("Report") recommending that the district court: (1) grant habeas relief with respect to the imposition of the two five-year sentence enhancements; and (2) deny the other claims for relief, including the claim that Dillard's due process rights were violated by the introduction of expert testimony on BWS during the trial. On July 9, 1999, the district court adopted the Magistrate's Report in full and issued an order granting in part and denying in part Dillard's petition. Dillard and the State timely appealed.
 
 STANDARD OF REVIEW
 
 32
 Our review of Dillard's petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997) (holding that AEDPA applies to all habeas petitions filed after April 24, 1996). Section 2254(d) of AEDPA provides that to obtain federal habeas relief, a petitioner in state custody must demonstrate that the state court's adjudication of the merits of his case "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. S 2254(d)(1) (Supp. IV. 1998) (emphasis added).
 
 
 33
 EXPERT TESTIMONY REGARDING BATTERED WOMEN'S SYNDROME
 
 
 34
 Dillard contends that the trial court violated California Evidence Code S 1107,[5] and his federal constitutional right to a fair trial, by allowing the prosecution to introduce into evidence Pincus's expert testimony concerning BWS. Specifically, Dillard argues that the prosecution failed to establish the "relevancy" of Pincus's testimony by offering proof that Stephanie Rick actually suffered from BWS. Dillard argues that the expert's testimony was inadmissible because the evidence did not show that Rick was "abused physically and psychologically over an extended period of time" by Dillard, "the dominant male figure in [her] li[fe]. " Humphrey, 13 Cal.4th at 1083-84 (describing symptoms of BWS).
 
 
 35
 The State asserts that the trial judge properly limited Pincus's expert testimony regarding BWS. The State argues that trial judge adhered to S 1107's "relevancy" requirement by admitting Pincus's testimony for a narrow purpose: "to allow the jury to better judge the credibility of the victim." The State argues that Rick's credibility was relevant because it had been placed at issue by her recantation. The state also points out that, consistent with the requirements ofS 1107, the trial court correctly instructed the jury that it could not consider Pincus's testimony as evidence of "whether or not the [crime] did or did not occur." Accordingly, the state asks that we conclude that "the [trial] court's instruction properly reflected the relevant state statutory limitations on BWS evidence."
 
 
 36
 We need not decide, however, whether the admission of Pincus's BWS testimony was error under California law.[6] Even if it were, to obtain habeas relief, Dillard must show that the admission of the BWS evidence "rendered the trial so fundamentally unfair as to violate due process." Windham v. Merkle, 163 F.3d 1092, 1103 (9th Cir. 1998). We conclude that it did not.
 
 
 37
 Pincus's expert testimony about BWS tended to discredit Stephanie Rick's change in her story as who had inflicted her injuries. But her credibility as a witness was destroyed anyway. Her trial testimony was patently unbelievable, as demonstrated by the testimony of Detective Mauk and Kimberly Frazier, in whom she had confided immediately after the incident. Mauk and Frazier related Rick's prior inconsistent statements and exposed to the jury the implausibility of Rick's revisionist story. The jury was asked to believe either: (1) that Rick had sustained two black eyes, a split lip, and multiple bruises as the result of a violent beating by Dillard (her original story); or (2) that Rick had sustained those injuries by "socking [herself] in the face" (her revisionist story). Moreover, the jury was well aware that Rick had a strong motive to recant her allegations against Dillard. In the prosecutor's closing statement, she argued that Rick "loves [Dillard]. She even married him . . . and she doesn't want him to be punished."
 
 
 38
 On the basis of the record, we conclude that, notwithstanding the expert's testimony about BWS, no rational trier of fact would have believed Rick's story. The evidence against Dillard was overwhelming. Thus, even if the admission of BWS testimony violated California law, a question we do not decide, it did not violate Dillard's due process rights because it did not render his trial fundamentally unfair. Windham, 163 F.3d at 1103. Because no constitutional violation occurred, the admission of BWS testimony by the trial court did not "result in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determination by the Supreme Court of the United States." 28 U.S.C. S 2254(d)(1).[7]
 
 
 39
 TRIAL COURT DID NOT VIOLATE DILLARD'S RIGHTS BY REFUSING TO APPOINT THE REBUTTAL EXPERT THAT HE REQUESTED
 
 
 40
 Dillard next contends that the trial court violated his constitutional rights by refusing his attorney's request for the appointment of a rebuttal expert. Specifically, Dillard claims that his trial counsel "requested that Dillard be appointed an expert to examine [the victim] to determine if she actually suffered from BWS" but that the court "never signed any such request."
 
 
 41
 In support of his claim, Dillard cites the transcript of a September 12, 1994 hearing "calendared for determination whether the court will appoint experts requested by the defense." But an examination of the transcript of this hearing does not support Dillard's claim. The transcript shows that defense counsel had previously requested the appointment of two experts: a pharmacologist named Ronald Siegal and Dr. Jacqueline Green, the psychiatrist who had treated Stephanie Rick for several months prior to and after the alleged beating by Dillard.
 
 
 42
 At the hearing, the court said to defense counsel: "[a]s I understand . . . you no longer want[ ] the pharmacologist." Counsel replied, "[t]hat's correct." The trial court then agreed to appoint Dr. Green to testify for the defense. The rest of the discussion between defense counsel and the trial court concerned the amount of money Dr. Green would receive for testifying. The trial court agreed to pay Dr. Green for her testimony. Thus, the record supports the state's argument that "the trial court granted Petitioner the appointment of the only expert he requested."
 
 
 43
 Moreover, defense counsel presented Dr. Green to the jury as a medical professional who had treated Stephanie Rick and would testify at trial that Rick did not suffer from BWS.[8] In his opening statement, defense counsel said:
 
 
 44
 [u]ltimately, we will hear from Dr. Green, that is Stephanie [Rick's] psychiatrist, who had been treat ing her severe depression preceding this incident and the relationship. . . . [I]n [Dr. Green's ] opinion, though she is not a, quote, "expert on battered women's syndrome," she works at a clinic here in Los Angeles where they see battered women. She . . . is aware of this incident [with Dillard ] from Stephanie, and determined that Stephanie does not suffer from battered women's syndrome.
 
 
 45
 In her testimony, Dr. Green stated that she believed thatStephanie Rick had not been beaten by Dillard on the evening of March 13, 1994. Dr. Green based this conclusion on Rick's account of the events of March 13, which Rick told her in a therapy session several months later. The prosecutor attacked Dr. Green's credibility on cross examination by revealing that Rick had not told Dr. Green about the extent of the injuries she sustained on the evening of March 13, 1994. In addition, the prosecutor elicited from Dr. Green that she had seen only "a couple" of women with BWS in her practice.
 
 
 46
 The fact that the prosecution conducted a damaging cross examination of Dr. Green does not support Dillard's contention that he was denied the expert of his choosing. The jury's decision to credit Pincus's expert testimony over Dr. Green's expert testimony shows only that defense counsel miscalculated the degree to which Dr. Green would serve as an effective rebuttal witness. The responsibility for that error rests solely on defense counsel himself; the trial court did nothing improper.
 
 
 47
 THE DISTRICT COURT DID NOT VIOLATE DILLARD'S CONSTITUTIONAL RIGHTS BY TAKING JUDICIAL NOTICE OF PRIOR FELONY CONVICTIONS
 
 
 48
 In addition to being charged with inflicting corporal injury upon a cohabitant, Dillard was also charged with having committed two prior "serious" felonies pursuant to California Penal Code S 667(a)(1). Before the jury retired to deliberate, the prosecution asked the trial judge to take judicial notice, pursuant to California Evidence Code S 452,[9] of two Los Angeles County Superior Court criminal case files. These files contained records "reflect[ing] that an individual by the name of Adrian Lamont Dillard" previously had suffered two prior "serious" convictions: one for robbery and one for assault with intent to commit rape. The trial judge agreed to take judicial notice of those records, and instructed the jury as follows:
 
 
 49
 When the court takes judicial notice of certain facts, you must regard those facts as conclusively proven. . . . [Y]ou must find to be true what the records indi cate that I'm about to say . . . .
 
 
 50
 The court takes judicial notice of the fact that the court file in case number A979007 reflects that an individual by the name of Adrian Lamont Dillard, with booking number 1126410, was charged with having committed a serious felony; to wit, a robbery, in violation of Penal Code Section 211, on Novem ber 20, 1988, and that he was found guilty of the charge . . . .
 
 
 51
 Next, the court takes judicial notice of the L.A. Superior Court file in case number BA007887, and finds that the contents of the file reflect that an indi vidual by the name of Adrian Lamont Dillard, with booking number 1699056, was charged with having committed a serious felony; to wit, assault with intent to commit rape, in violation of Penal Code Section 220, on November 10th, 1989 [and] that he was found guilty of that charge . . . .
 
 
 52
 The jury subsequently convicted Dillard of inflicting corporal injury upon Stephanie Rick pursuant to S 273.5(a). The jury also filled out two "special verdict forms, " stating its finding of "true" that Dillard was the "individual by the name of Adrian Lamont Dillard" who had been previously convicted of robbery and assault with intent to commit rape. Because both of these offenses qualified as "serious" felonies under California law, the jury's findings meant that Dillard had two "strikes" under California's "three strikes law."[10] Dillard's conviction for inflicting corporal injury upon Rick was his third "strike."[11] As a three strikes offender, Dillard was sentenced pursuant to California Penal Code S 667(e)(2)(A)(ii). This provision mandates an indeterminate sentence of twenty-five years to life in prison for a defendant convicted of a felony when that defendant "has two or more prior felony convictions." Id.[12]
 
 
 53
 Dillard contends that the trial court violated his constitutional right to due process and a jury trial by directing a verdict on an essential element of his "three strikes" conviction. Specifically, Dillard contends that the trial court erred by taking judicial notice of two Los Angeles County Superior Court criminal case files, which contained official records of his two prior convictions. By taking judicial notice of the records, Dillard asserts that the trial court unconstitutionally removed from the jury the question whether he had suffered the prior felony convictions.
 
 
 54
 Dillard correctly states that California law provides a criminal defendant with a statutory right to have a jury determine the question whether he has suffered convictions for prior felony offenses.[13] Dillard's claim fails, however, because he cannot show that the judicial notice taken by the state trial court infringed on this statutory right, much less rose to the level of a federal constitutional violation.
 
 
 55
 The state trial court instructed the jury to find that "an individual by the name of Adrian Lamont Dillard" had been convicted previously of two serious felony offenses: robbery and assault with intent to commit rape. This instruction by the trial court did not direct the jury to find that the defendanthimself had suffered these two prior convictions. The jury was still free to find that the "individual by the name of Adrian Lamont Dillard" was not the same person as the defendant.
 
 
 56
 The only issue foreclosed by the state trial judge's taking judicial notice of the two criminal case files was that a person with Dillard's name had previously suffered two prior felony convictions for robbery and assault with intent to commit rape. It was up to the jury to determine whether the prosecution had carried its burden of proving that the "individual named Adrian Lamont Dillard" and the defendant named "Adrian Lamont Dillard" were the identical person.[14] We conclude, therefore, that Dillard cannot claim that the trial judge erred, much less that the trial judge committed constitutional error, in taking judicial notice of his prior convictions.[15]
 
 
 57
 DILLARD'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE IMPOSITION OF TWO FIVEYEAR SENTENCE ENHANCEMENTS BECAUSE THE JURY DID NOT FIND THAT HIS INSTANT OFFENSE CONSTITUTED A SERIOUS FELONY
 
 
 58
 The State appeals the portion of the district court's order finding that the two five-year sentence enhancements imposed by the trial court were unconstitutional.
 
 
 59
 Dillard's sentence enhancements were imposed by the state trial court pursuant to California Penal CodeS 667(a), which provides:
 
 
 60
 (1) [A]ny person convicted of a serious felony who previously has been convicted of a serious felony in this state . . . shall receive, in addition to the sentence imposed by the court for the present offense, a five year enhancement for each such prior conviction on charges brought and tried separately. The terms of the present offense and each enhancement shall run consecutively.
 
 Z3
 
 61
 (4) As used in this subdivision, "serious felony," means a serious felony listed in subdivision (c) of [California Penal Code] Section S 1192.7.
 
 
 62
 Cal. Penal Code S 667(a)(1), (4) (emphasis added).
 
 
 63
 California Penal Code S 1192.7(c) enumerates fortyone offenses which qualify as "serious felonies."[16] Dillard's instant felony conviction, willfully inflicting corporal injury upon a cohabitant, is not listed as one of the forty-one enumerated "serious" offenses. Section 1197.2(c) does, however, include within the list of "serious" offenses "any felony in which the defendant personally uses a firearm." Cal. Penal Code S 1192.7(c)(1)(8). Thus, although corporal injury to a cohabitant does not by itself qualify as a serious felony under S 1192.7, corporal injury to a cohabitant by a defendant who "personally uses a firearm" does qualify as a serious felony under S 1192.7(c).
 
 
 64
 At Dillard's sentencing, the trial judge imposed a prison term of twenty-five years to life pursuant to the "three strikes" law but did not impose any S 667(a)(1) sentence enhancements. The State argued to the California Court of Appeal that, because there was evidence that Dillard had "personally use[d] a firearm" in the commission of the offense against Stephanie Rick, Dillard's conviction qualified as a "serious" felony under S 1192.7(c). The State asserted that the trial court should have imposed two five-year sentence enhancements pursuant to S 667(a)(1). The California Court of Appeal agreed and remanded for resentencing. On remand, the state trial judge imposed the two five-year sentencing enhancements.[17]
 
 
 65
 During federal habeas proceedings, Dillard argued that the California courts committed constitutional error in imposing the two five-year sentence enhancements. Dillard asserted that he had a constitutional right to have the jury -not the judge -decide the question whether he had "personally use[d] a firearm" while injuring Stephanie Rick. The Magistrate Judge agreed and recommended granting habeas relief on this claim. In so concluding, the Magistrate Judge determined that the question whether Dillard had used a firearm while injuring Rick was an "element" of the charged crime and that "the Constitution guarantees the right to have a jury, rather than a judge, find the existence of each element of a charged offense beyond a reasonable doubt." The district court adopted the Magistrate Judge's recommendation and granted habeas relief.[18]
 
 
 66
 The question we must decide then, is whether the district court correctly concluded that Dillard's constitutional rights were violated when the state trial judge imposed two five-year sentence enhancements without a finding by the jury that Dillard's crime qualified as a "serious felony" under S 1192.7(c).
 
 
 67
 The Sixth Amendment provides that"[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." The Fourteenth Amendment states that no one shall be deprived of liberty without"due process of law." Taken together, these provisions of the Constitution "require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." United States v. Gaudin, 515 U.S. 506, 509-10 (1995); In re Winship, 397 U.S. 358, 364 (1970). Consequently, if the trial judge, rather than the jury, makes the finding as to one of the elements of the charged crime, the defendant's constitutional rights have been violated. Gaudin, 515 U.S. at 510.
 
 
 68
 In applying the principle announced in Winship, the Supreme Court has drawn a distinction between an "element" of a crime and a "sentencing factor." An "element" is a fact that is considered "essential" to the definition of the charged offense and must be proved to a jury beyond a reasonable doubt. A "sentencing factor" is a fact bearing on punishment, "the existence or nonexistence of which [a court] is willing to recognize as an exculpatory or mitigating circumstance affecting the degree of culpability." McMillan v. Pennsylvania, 477 U.S. 79, 84 (1986) (quoting Patterson v. New York, 432 U.S. 197, 207 (1977)). Unlike an element, a sentencing factor may be found by a judge rather than a jury and by "preponderance of the evidence" rather than "beyond a reasonable doubt."
 
 
 69
 The critical difference between an element and a sentencing factor is not susceptible to a "bright-line" test. McMillan, 477 U.S. at 91. Instead, it often turns on "differences of degree." Id. Determining that difference, and assigning the appropriate measure of constitutional protection, will not always depend on the labels affixed by the legislature. As the Supreme Court has explained:
 
 
 70
 [I]f Winship were limited to those facts that consti tute a crime as defined by state law, a State could undermine many of the interests that decision sought to protect without effecting any substantive change in its law. It would only be necessary to redefine the elements that constitute different crimes, characteriz ing them as factors that bear solely on the extent of punishment . . . . Winship is concerned with sub stance rather than this kind of formalism. The ratio nale of that case requires an analysis that looks to the "operation and effect of the law as applied and enforced by the state."
 
 
 71
 Mullaney v. Wilbur, 421 U.S. 684, 698-99 (1975) (internal quotations omitted).
 
 
 72
 Our determination concerning whether the fact that Dillard "personally use[d] a firearm" is an "element" or a "sentencing factor" requires that we look beyond the enumerated elements of the crime for which Dillard was convicted. We must ana-lyze "the operation and effect of the law" mandating the two five-year sentence enhancements "as applied and enforced by the state." Id. at 699. We must then determine whether, in this instance, "Winship's reasonable-doubt requirement applies to facts not formally identified as elements of the offense charged." McMillan, 477 U.S. at 86.
 
 
 73
 The Court's decision in McMillan provides helpful guidance. In McMillan, the Court considered a constitutional challenge to the Pennsylvania Mandatory Minimum Sentencing Act ("Act"). The Act provides that anyone convicted of certain enumerated felonies is subject to a mandatory minimum sentence of five years imprisonment if the sentencing judge finds that the defendant "visibly possessed a firearm" during the commission of the offense. Id. at 81. In upholding the constitutionality of the Act, the McMillan Court stated: "[it] operates to divest the judge of discretion to impose any sentence of less than five years for the underlying felony; it does not authorize a sentence in excess of that otherwise allowed for that offense." Id. at 81-82 (emphasis added).
 
 
 74
 The McMillan Court emphasized that this distinction was critical to separating out "elements" from "sentencing factors." The Court explained that the "sentencing factor" label was appropriate because the judge's finding that the defendant "visibly possessed a firearm" during the offense "neither alters the maximum penalty for the crime committed nor creates a separate offense calling for a separate penalty." Id. at 87-88.
 
 
 75
 The statute at issue in this case, California Penal Code S 667(a), mandates the precise type of "finding" that the McMillan Court indicated should be classified an "element" rather than a "sentencing factor." First, the finding mandated by S 667 -that the defendant "personally use[d] a firearm" in the commission of the underlying offense -is a fact that "alters the maximum penalty for the crime committed." Id. Without the finding that Dillard "personally used a firearm" while inflicting corporal injury upon Stephanie Rick, his crime would not qualify as a "serious" felony mandating the imposition of the two five-year sentence enhancements. These enhancements are imposed in addition to his sentence of twenty-five years to life in prison.
 
 
 76
 Second, a finding that Dillard "personally use[d] a firearm" in the commission of the offense against Stephanie Rick "creates a separate offense calling for a separate penalty." Id. If Dillard is merely sentenced on the basis of the facts found beyond a reasonable doubt by the jury, he is guilty of willfully inflicting corporal injury upon Rick. By contrast, if Dillard is sentenced on the basis of the facts found by the trial judge, he is guilty of willfully inflicting corporal injury upon Rick while personally using a firearm. This additional fact transforms a felony conviction warranting a prison sentence of twenty-five years to life into a "serious" felony convictionwarranting a prison sentence of twenty-five years to life plus two sentence enhancements of five years each.
 
 
 77
 We conclude, therefore, that the additional fact found by the trial judge in this case is an element that transforms the offense for which Dillard was charged and convicted into a different, more serious offense that exposes him to greater and additional punishment. Accordingly, we agree with the district court that Dillard's constitutional rights were violated when the state trial judge imposed the two five-year sentence enhancements without having a jury determine beyond a reasonable doubt that Dillard "personally use[d ] a firearm" in the commission of the offense against Rick.[19]
 
 
 78
 THE FACT THAT JURY DID NOT FIND BEYOND A REASONABLE DOUBT THAT DILLARD USED A FIREARM IN THE COMMISSION OF THE OFFENSE WAS NOT HARMLESS ERROR
 
 
 79
 Our determination that Dillard's constitutional rights were violated does not end the inquiry. Because Dillard litigates this federal constitutional rights violation in a habeas proceeding, we must apply the harmless error analysis set forth by the Supreme Court in Brecht. See Bains, 204 F.3d at 977 (holding that "the Brecht standard should apply uniformly in all federal habeas corpus cases under S 2254"); see also Neder v. United States, 527 U.S. 1, 8-16 (1999) (holding that trial judge's instruction to jury that omitted an element of the offense is subject to harmless error analysis). Thus, in determining whether this violation of Dillard's constitutional rights entitles him to habeas relief, we must ask "whether the error had a substantial and injurious effect" on the outcome of the trial. Brecht, 507 U.S. at 637 (internal citations omitted). Under this standard of review, we may not grant habeas relief unless Dillard can establish that, as a result of the state trial court's error, he suffered "actual prejudice"; i.e., that as a result of the error, the outcome of the trial was rendered fundamentally unfair. Id.
 
 
 80
 We conclude that the state trial court's error is not harmless under the Brecht standard. Because the evidence presented to establish that Dillard had personally used a firearm in the commission of the offense against Stephanie Rick was not substantial, the trial judge's finding that Dillard personally used a firearm was prejudicial. We reach this conclusion for several reasons. First, the trial court struck from the indictment the charge that Dillard had used a firearm in the commission of the offense against Rick after the defense argued that no "credible evidence" supported that charge. Second, Detective Mauk testified that his search of Dillard and Rick's residence uncovered no physical evidence that Dillard had used a firearm. Mauk acknowledged that he failed to find a gun, bullets, shell casings, powder burns or any othertangible physical evidence that Dillard had used a firearm on the evening that the crime occurred.
 
 
 81
 Third, and most significantly, the State conceded at trial that it had failed to prove that Dillard had used a gun while inflicting corporal injury upon Stephanie Rick. The prosecutor stated in her closing argument: "[Dillard] is not charged with firing between [Rick's] legs. There is no evidence that any bullets were recovered, and I am not trying to imply by anything that I have said or done that there was any such evidence." The only evidence that Dillard used a firearm during the commission of the offense consists of the three holes found by Detective Mauk in the carpet of Dillard and Rick's home, and hearsay statements that were attributed to Rick, which she testified that she had not made. We cannot conclude on the basis of this evidence that a jury would have found beyond a reasonable doubt that Dillard used a firearm while inflicting corporal injury upon Rick. Accordingly, we affirm the district court and hold that Dillard is entitled to habeas relief with respect to this claim.
 
 CONCLUSION
 
 82
 We hold that the trial judge did not violate Dillard's constitutional rights by allowing a BWS expert to testify at trial; that Dillard was not prevented from presenting rebuttal expert testimony on BWS; and that the trial judge did not err in taking judicial notice of the state court files. We also hold that Dillard's constitutional rights under the Sixth and Fourteenth Amendments were violated by the imposition of the two fiveyear sentence enhancements by the trial judge without a finding by the jury that Dillard "personally use[d ] a firearm." Accordingly, the order of the district court is AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 The facts are taken from the opinion by the California Court of Appeal for the Second District, Division 5. People v. Dillard, 45 Cal.App.4th 1417 (1996) (ordered depublished on October 16, 1996).
 
 
 [2]
 Dillard and Rick were married on April 12, 1994.
 
 
 [3]
 California Penal Code S 667 provides, in relevant part:
 (b) It is the intent of the Legislature in enacting subdivisions (b) to (i), inclusive, to ensure longer prison sentences and greater punishment for those who commit a felony and have been previ ously convicted of serious and/or violent felony offenses.
 * * *
 (e) For purposes of subdivisions (b) to (i), inclusive, and in addi tion to any other enhancement or punishment provisions which may apply, the following shall apply where a defendant has a prior felony conviction:
 * * *
 (2)(A) If a defendant has two or more prior felony convictions as defined in subdivision (d) that have been pled and proved, the term for the current felony conviction shall be an indeterminate term of life imprisonment with a minimum term of the indetermi nate sentence calculated as the greater of:
 (i) Three times the term otherwise provided as punishment for each current felony conviction subsequent to the two or more prior felony convictions.
 (ii) Imprisonment in the state prison for 25 years.
 
 
 [4]
 California Penal Code S 667(a)(1) provides that:
 [A]ny person convicted of a serious felony who previously has been convicted of a serious felony in this state . .. shall receive, in addition to the sentence imposed by the court for the present offense, a five-year enhancement for each such prior conviction on charges brought and tried separately. The terms of the present offense and each enhancement shall run consecutively.
 
 
 [5]
 Section 1107 of the California Evidence Code provides specifically for the admission of BWS testimony. The relevant portion of the code states:
 (a) In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding battered women's syn drome, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge.
 (b) The foundation shall be sufficient for admission of this expert testimony if the proponent of the evidence establishes its rele vancy and the proper qualifications of the expert witness. Expert opinion testimony on battered women's syndrome shall not be considered a new scientific technique whose reliability is unproven.
 Cal. Evid. Code S 1107(a)-(b) (emphasis added).
 
 
 [6]
 Intermediate California appellate courts have reached differing results in interpreting the "relevancy" requirement ofS 1107. Compare People v. Gomez, 72 Cal.App.4th 405, 416 (1999) (holding that the trial court erred in admitting expert BWS testimony to rehabilitate a recanting victim's credibility where the prosecution had not introduced evidence of a preexisting abusive relationship), with People v. Williams, 78 Cal.App.4th 1118, 1121-23, 1129 (2000) (stating that "we disagree with the limitation placed on admission of [BWS] evidence . . . in People v. Gomez"), and People v. Morgan, 58 Cal.App.4th 1210, 1216-17 (1997) (holding that BWS expert testimony is admissible to rehabilitate a recanting victim's credibility without a proffer of evidence of a preexisting abusive relationship between victim and defendant).
 Thus, as demonstrated by Gomez, Williams, and Morgan, the California intermediate appellate courts have divergent views concerning the proper interpretation of the "relevancy" requirement of S 1107. Cal. Evid. Code S 1107(b). The balance of authority tilts in favor of allowing the prosecution to introduce expert BWS evidence to rehabilitate a recanting victim's credibility without proffering evidence of prior abuse. The California Supreme Court has not yet decided this question of state law.
 
 
 [7]
 We have not applied a harmless error analysis under Brecht v. Abrahamson, 507 U.S. 619, 623 (1993), because no constitutional violation occurred. However, even if we were to assume an error of constitutional dimension, that error would be harmless because it did not have "a substantial and injurious effect" on the verdict. Id.
 
 
 [8]
 Defense counsel's impression of Dr. Green's qualifications was conveyed to, and accepted by, the trial court. The court stated:
 Well, from what I've heard so far in opening statements and in conversations about Dr. Green, it sounds like Dr. Green is a psy chiatrist who has contact with battered women. . . .[S]he may not be the best expert in [BWS], but she will at least minimally qual ify to testify [on BWS]. . . .
 
 
 [9]
 S 452. Matters which may be judicially noticed
 Judicial notice may be taken of the following matters . . .
 (c) Official acts of the legislative, executive, and judicial depart ments of the United States and of any state of the United States.
 (d) Records of (1) any court of this state or (2) any court of record of the United States and of any state of the United States.
 Cal. Code Evid. S 452(c)-(d).
 
 
 [10]
 In People v. Hazelton, 14 Cal.4th 101, 104 (1996), the California Supreme Court explained the enactment of the "Three Strikes" law as follows:
 In March 1994, the [California] Legislature enacted its version of the "Three Strikes and You're Out" law by amending [California Penal Code] section 667. In general, the legislation provides lon ger sentences for certain prior serious or violent felonies popu larly denoted "strikes." A "two strike" case involves one prior qualifying felony; a "three strike" case involves two or more prior qualifying felonies. Predicate prior felonies are defined in section 667, subdivision (d), as . . . any offense defined in subdi vision (c) of Section 1192.7 as a serious felony in this state . . . .
 Id. (internal quotations omitted).
 Section 1192.7 of the California Penal Code lists forty-one felonies that qualify as a "serious felonies" for "three strikes" purposes. Robbery and assault with the intent to commit rape are among the forty-one offenses listed as "serious felonies." Cal. Penal CodeS 1192.7(c)(19), (29).
 
 
 [11]
 Under California's "three strikes" law the third felony -or "strike" -need not be a "serious" felony pursuant to S 1192.7(c) for the indeterminate prison term of twenty-five years to life in prison to be imposed. See, e.g., Monge v. California, 524 U.S. 721, 724 (1998) (stating that "[u]nder California's `three strikes' law, a defendant convicted of a felony who has two qualifying prior convictions for `serious felonies' receives a minimum sentence of 25 years to life") (emphasis added). By contrast, in order for a five-year sentence enhancement to be imposed pursuant to S 667(a)(1), the third felony must qualify as a "serious" felony pursuant to S 1192.7(c).
 
 
 [12]
 See supra note 3.
 
 
 [13]
 California Penal Code S 1025 provides, in relevant part:
 [T]he question of whether or not the defendant has suffered the prior conviction shall be tried by the jury that tries the issue [of the instant alleged crime] upon the plea of not guilty, or in the case of a plea of guilty or nolo contendere, by a jury impaneled for that purpose, or by the court if a jury is waived.
 Cal. Penal Code S 1025(b).
 
 
 [14]
 In addition to the court records, the prosecution also introduced the testimony of two witnesses, a deputy district attorney and a police department photographer, to confirm that the individual named Adrian Lamont Dillard listed in the criminal case files was same person as the defendant Adrian Lamont Dillard. We also note that the defendant has never contested that he was falsely identified as the person convicted of these prior offenses.
 
 
 [15]
 Indeed, the California Supreme court has recently endorsed the type of judicial notice taken by the trial judge in Dillard's case. People v. Kelii, 21 Cal.4th 452, 458-59 (1999) ("The court [may], however, instruct the jury to the effect that the defendant is the person whose name appears on the documents admitted to establish the conviction. This procedure would appear to leave the jury little to do except to determine whether those documents are authentic and, if so, are sufficient to establish that the convictions the defendant suffered are indeed the ones alleged. Whether this role makes sense is not for us to say. If the Legislature wants to provide a greater, or more precisely defined, role for the jury, or chooses to eliminate the jury altogether . . . it may still do so.").
 
 
 [16]
 There is another definition of "serious felony" that was potentially applicable in this case. California Penal Code S 1192.7(c)(1)(8) provides that a "serious felony" is "any felony in which the defendant personally inflicts great bodily injury on any person, other than an accomplice." Id. The Magistrate's Report discusses in detail why Dillard's conviction for infliction of corporal injury upon Rick does not constitute "great bodily injury." The State does not appeal this portion of the Magistrate's Report, which was adopted by the district court.
 
 
 [17]
 Dillard had also claimed that he had been deprived of adequate notice of the firearm charge because it was not included in the information filed against him. The court concluded that Dillard had adequate notice of the firearm allegations in the testimony provided at the preliminary hearing. The Magistrate's Report upheld this portion of the state court's ruling, and Dillard does not challenge it in this appeal.
 
 
 [18]
 The Magistrate's Report states:
 the Constitution guarantees the right to have a jury, rather than a judge, find the existence of each element of a charged offense beyond a reasonable doubt. See generally, In re. Winship, 397 U.S. 358, 364 (1970). . . . [I]n order for the section 273.5 convic tion in this case to qualify as a serious felony as defined in sec tion 1192.7(c)(8), the jury was required to find beyond a reasonable doubt that in the commission of the offense petitioner . . . personally used a gun. . . . [T]his court concludes that the state courts constitutionally erred by imposing the section 667(a)(1) enhancements based on gun-use because the jury did not determine beyond a reasonable doubt that petitioner used a gun.
 
 
 [19]
 The United States Supreme Court recently addressed a similar question when it decided Apprendi v. New Jersey, 120 S. Ct. 2348 (2000). In Apprendi, the Court held that: "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 2362-63. The Supreme Court has not decided whether Apprendi applies retroactively in habeas proceedings. Nor has our circuit definitively resolved this question. Compare Jones v. Smith, 231 F.3d 1227, 1238 (9th Cir. 2000) (declining to apply Apprendi rule retroactively on habeas "insofar as it effects discrepancies between an information and jury instructions" where the jury instructions included, and the jury found, the factor omitted from the information; i.e., the allegation that the attempted murder was "premeditated") with Hoffman v. Arave, 236 F.3d 523, 543-48 (9th Cir. 2000) (Pregerson, J., concurring) (urging retroactive application of Apprendi to petitioner's constitutional challenge to state statute requiring trial judge, rather than the jury, to "determine facts that increase the potential penalty from life imprisonment to death").
 Because uncertainty remains regarding the question whether Apprendi applies retroactively on habeas, and because Apprendi is not essential to our holding in this case, we do not rely on it. We agree with the analysis of the district court, which relied on Winship , 397 U.S. at 364 (decided in 1970), to find that the question whether Dillard "personally use[d] a firearm" during the commission of the crime was an element of the offense and therefore must be submitted to the jury and proved beyond a reasonable doubt. In affirming the district court, we note that Winship's progeny,Mullaney and McMillan, provide further support for the district court's analysis.