**Michael Patrick MCELVAIN, Petitioner,**

v.

**Gail LEWIS, Warden, and Attorney General of the State of California, Respondents.**

**No. CV 01–5634–DOC(RC).**

United States District Court, C.D. California.

Sept. 18, 2003.

Kerry R. Bensinger, Bensinger, Ritt & Botterud, Pasadena, CA, for Petitioner.

Michael C. Keller, Deborah J. Chuang, CAAG—Office of Attorney General of California, Los Angeles, CA, for Respondents.

## ORDER ADOPTING FINAL REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

CARTER, District Judge.

Pursuant to 28 U.S.C. Section 636, the Court has reviewed the Petition and other

papers along with the attached Final Report and Recommendation of United States Magistrate Judge Rosalyn M. Chapman, as well as petitioner's objections, and has made a *de novo* determination.

IT IS ORDERED that (1) the Final Report and Recommendation is approved and adopted; (2) the Final Report and Recommendation is adopted as the findings of fact and conclusions of law herein; and (3) Judgment shall be entered denying the petition for writ of habeas corpus and dismissing the action with prejudice.

IT IS FURTHER ORDERED that the Clerk shall serve copies of this Order, the Magistrate Judge's Final Report and Recommendation and Judgment by the United States mail on the parties.

## JUDGMENT

Pursuant to the Order of the Court adopting the findings, conclusions, and recommendations of United States Magistrate Judge Rosalyn M. Chapman,

IT IS ADJUDGED that the Petition for Writ of Habeas Corpus is denied and the action is dismissed with prejudice.

## FINAL REPORT AND RECOMMEN-DATION OF A UNITED STATES MAGISTRATE JUDGE

CHAPMAN, United States Magistrate Judge.

This Final Report and Recommendation is submitted to the Honorable David O. Carter, United States District Judge, by Magistrate Judge Rosalyn M. Chapman, pursuant to the provisions of 28 U.S.C. § 636 and General Order 01–13 of the United States District Court for the Central District of California.

## BACKGROUND

### I

On May 28, 1998, in Los Angeles County Superior Court case no. YA034875, a jury convicted petitioner Michael Patrick McElvain of one count of forcible rape in violation of California Penal Code ("P.C.") § 261(a)(2), two counts of inflicting corporal injury on a cohabitant in violation of P.C. § 273.5(a), one count of assault with a deadly weapon and by means of force likely to produce great bodily injury in violation of P.C. § 245(a)(1), two counts of making terrorist threats in violation of P.C. § 422 and one count of vandalism in violation of P.C. § 594(a); however, the jury found petitioner not guilty of a separate forcible rape count, a count of false imprisonment by violence and a count of stalking. Clerk's Transcript ("CT") 372–384; Reporter's Transcript ("RT") 1650:20–1657:8. Petitioner was sentenced to 12 years and 4 months in state prison. RT 1667:3–1668:21.

The petitioner appealed his convictions to the California Court of Appeal, which affirmed the judgment in an unpublished opinion filed July 21, 1999. Answer, Exh. A. On August 30, 1999, petitioner filed a petition for review in the California Supreme Court, which denied the petition on September 29, 1999. Motion to Dismiss ("Motion"), Exhs. B–C.

On December 21, 1999, petitioner filed a petition for habeas corpus relief in the Los Angeles Superior Court, which denied the petition the same day. Motion, Exh. D. On January 21, 2000, petitioner filed a habeas corpus petition in the California Court of Appeal, which was denied on February 9, 2000. Motion, Exh. E. On March 16, 2000, petitioner, through his counsel, filed a petition for habeas corpus relief in the California Supreme Court, which was

denied on June 28, 2000. Motion, Exhs. F–G.

Subsequently, petitioner filed a second petition for writ of habeas corpus in the California Supreme Court, which denied the petition on May 1, 2002, with citation to *In re Clark*, 5 Cal.4th 750, 21 Cal. Rptr.2d 509, 855 P.2d 729 (1993), *In re Robbins*, 18 Cal.4th 770, 780, 77 Cal. Rptr.2d 153, 959 P.2d 311 (1998), *In re Dixon*, 41 Cal.2d 756, 264 P.2d 513 (1953), and *In re Miller*, 17 Cal.2d 734, 112 P.2d 10 (1941).

## II

In affirming petitioner's convictions, the California Court of Appeal made the following findings of fact:[1] Petitioner, 33 years old, began dating the victim when she was 19 years of age. The off-again and on-again relationship (at one time including an engagement to be married) was tempestuous, as petitioner resented any time the victim spent with anyone other than himself. He would periodically physically abuse her. As time went by, petitioner became more violent and possessive. At one point, when the victim tried to end the relationship, petitioner threatened to disseminate copies of a videotape he had made, unbeknownst to her, of the two of them having sex.

On one occasion, petitioner made the victim clean the house late at night, on her hands and knees and in the nude. The abuse included forcible sexual relations and numerous beatings that left the victim badly bruised. During one forcible sexual episode, petitioner ejaculated on the victim's stomach and then urinated on her. The victim eventually left petitioner and obtained a restraining order, to which petitioner paid no attention other than to threaten to kill the victim. When petition-

er accosted the victim at a public beach, a police officer came on the scene and arrested him. Petitioner soon telephoned the victim to threaten her with death. No prosecution ensued at this point.

Petitioner would continuously call the victim at her place of employment, sometimes several dozen times a day. His harassment included numerous public encounters. At one point, he extensively damaged her car by repeatedly slamming his pick-up door against the vehicle. When finally arrested on the charges that gave rise to this criminal prosecution, petitioner several times kicked the inside of the police car and threatened to kill the victim and her family.

## III

This action commenced on June 26, 2001, when petitioner, through his counsel, filed his initial habeas corpus petition challenging his convictions. On August 16, 2001, respondents filed a motion to dismiss the habeas corpus petition, arguing six of the twelve grounds in the petition were not exhausted. On October 15, 2001, petitioner, again through his counsel, filed an amended habeas petition deleting four claims, and on October 16, 2001, this Court determined the amended petition to be fully exhausted and ordered respondents to answer the petition. On November 1, 2001, respondents answered the amended petition. Petitioner filed a traverse on November 29, 2001.

Subsequently, petitioner requested leave to file a second amended petition ("SAP") for habeas corpus relief, adding the previously deleted claims, and on October 18, 2002, the Court granted petitioner's motion. Respondents filed a supplemental

---

**1.** Answer, Exh. A at 27–28.

answer on November 6, 2002.[2] On April 21, 2003, petitioner filed a motion for summary judgment, with supporting memorandum of points and authorities and the supporting declaration of Kerry R. Benzinger, which this Court treats as a traverse. On May 2, 2002, respondents filed a request to treat their previously filed answer and supplemental answer as an opposition to petitioner's summary judgment motion. The Court grants that request.

The pending second amended petition raises the following claims:

Ground One—"The [prosecutor] violated Petitioner's rights by basing his conviction upon false evidence—[a] false representation that Petitioner confessed [to] rape[.]" (SAP at 6);

Ground Two—"The state violated Petitioner's rights by surreptitiously eliciting incriminating statements from him without counsel present[.]" (SAP at 6–7);

Ground Three—Petitioner received ineffective assistance of counsel when his "trial counsel failed to discover the falsity of evidence used against [him], object to it, or make [the] jury aware of the falsity[.]" (SAP at 7);

Ground Four—Petitioner received ineffective assistance of counsel when his "trial counsel failed to call Petitioner as a witness, even though Petitioner had clearly expressed [a] desire to testify." (SAP at Addendum);

Ground Five—Petitioner received ineffective assistance of counsel when his "trial counsel failed to present evidence, of which he was aware, that Petitioner was physi-cally unable, because of diabetes and the use of medication, to commit rape." (SAP at Addendum);

Ground Six—Petitioner received ineffective assistance of counsel when his "trial counsel failed to investigate, interview and call witnesses and present evidence that would have impeached the alleged victim[.]" (SAP at Addendum);

Ground Seven—Petitioner received ineffective assistance of counsel when his "trial counsel failed to challenge the use of statements that were elicited from Petitioner in violation of his right to counsel." (SAP at Addendum);

Ground Eight—Petitioner received ineffective assistance of counsel when his "trial counsel failed to move to suppress the admission of statements that were elicited from Petitioner through coercion in violation of Petitioner's right against self-incrimination[.]" (SAP at Addendum);

Ground Nine—"The trial court erroneously admitted expert testimony on the Battered Women's Syndrome, depriving Petitioner of a fundamentally fair trial[.]" (SAP at Addendum);

Ground Ten—"The trial court erroneously admitted character evidence, depriving Petitioner of a fundamentally fair trial[.]" (SAP at Addendum);

Ground Eleven—Prosecutorial "misconduct deprived Petitioner of a fundamentally fair trial[.]" (SAP at Addendum); and

Ground Twelve—Petitioner received ineffective assistance of counsel when his "trial counsel repeatedly failed to object to

---

**2.** In their supplemental answer, respondents contend Grounds 9 through 12 are procedurally barred. Since this Court finds those grounds to be without merit, as discussed herein, it declines to address respondents' claim of procedural bar. *Franklin v. Johnson,* 290 F.3d 1223, 1232 (9th Cir.2002); *see also Barrett v. Acevedo,* 169 F.3d 1155, 1162 (8th Cir.) ("Although the procedural bar issue should ordinarily be resolved first, judicial economy sometimes dictates reaching the merits if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated."), *cert. denied,* 528 U.S. 846, 120 S.Ct. 120, 145 L.Ed.2d 102 (1999).

the admission of improper evidence including but not limited to bad character evidence, and failed to request limiting instructions[.]" (SAP at Addendum).

On August 27, 2003, a Report and Recommendation was filed addressing the merits of petitioner's claims, and denying the petition and dismissing the action. On September 10, 2003, petitioner filed objections to the Report and Recommendation. This Final Report and Recommendation addresses one of those objections. It continues to find no merit to petitioner's claims and to recommend denial of the petition and dismissal of the action.

## DISCUSSION

### IV

Petitioner's claims must be considered in light of the Antiterrorism and Effective Death Penalty Act of 1996 ("the AEDPA"), which worked substantial changes to the law of habeas corpus. *Moore v. Calderon,* 108 F.3d 261, 263 (9th Cir.), *cert. denied,* 521 U.S. 1111, 117 S.Ct. 2497, 138 L.Ed.2d 1003 (1997). Of specific importance to the petitioner's claim are the revisions made to 28 U.S.C. § 2254(d), which now provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim[¶] (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or [¶] (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Further, under the AEDPA, a federal court shall presume that a determination of factual issues made by a state court is correct, and petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The California Supreme Court denied petitioner's petition for review and habeas corpus petitions without written opinion. However, "[w]here there has been one reasoned state judgment rejecting a federal claim, [federal courts are to presume] later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker,* 501 U.S. 797, 803, 111 S.Ct. 2590, 2594, 115 L.Ed.2d 706 (1991). Thus, in addressing petitioner's claims, this Court will consider the reasoning of the California Court of Appeal, which issued a written decision denying Grounds Three, Four and Eight. However, since petitioner's other claims have not been addressed by any reasoned state court decision, this Court will conduct "an independent review of the record ... to determine whether the state court clearly erred in its application of controlling federal law." *Delgado v. Lewis,* 223 F.3d 976, 982 (9th Cir.2000); *Bailey v. Newland,* 263 F.3d 1022, 1028 (9th Cir.2001), *cert. denied,* 535 U.S. 995, 122 S.Ct. 1556, 152 L.Ed.2d 479 (2002).

### V

At petitioner's trial, the trial court admitted into evidence a recording of a telephone conversation between petitioner and the victim, as well as a transcription of the audiotaped conversation. Answer, Exh. A at 12. "The recording was made by police with the victim's cooperation. The conversation took place a few days before [petitioner] was arrested and charged. The victim called [petitioner] and engaged in a lengthy conversation, during which she ca-

joled him into admitting rape, assault, and the urination episode." *Id.* It is the transcription of the audiotape, not the audiotape itself, that petitioner claims was "false" evidence the prosecutor knowingly presented. Specifically, petitioner claims the transcript of the conversation between him and the victim falsely reflects petitioner telling the victim he is sorry for "ever raping" her; whereas, in fact, petitioner claims he said he was sorry for "ever raising a hand" to her.

To support Ground One, that the prosecutor presented "false" evidence that petitioner confessed to raping the victim, petitioner provides several declarations: (1) his own declaration, in which he states he never apologized to the victim for "raping" her, but instead stated "it hurt me to know I had 'ever raised a hand' to her" (Declaration of Michael McElvain, ¶ 15); (2) the declaration of petitioner's appellate attorney, Matthew Alger, who states he listened to the recording of petitioner's conversation with the victim, noted the "raping" versus "raising a hand" discrepancy in the audiotape; had Norman Perle, a forensic consultant, prepare an enhanced version of the audiotape; and had Karen Pierre, a legal secretary, listen to and transcribe the taped conversation (Declaration of Matthew Alger, ¶¶ 2–5); (3) the declaration of Norman Perle describing how he produced sound-enhanced copies of the audiotape of the conversation (Declaration of Norman Perle, ¶¶ 2–3); and (4) the declaration of Karen Pierre authenticating her separate transcriptions of the original and enhanced versions of the audiotape (Declaration of Karen Pierre, ¶ 2).

■ A criminal defendant's due process rights are violated if prosecutorial misconduct renders a trial "fundamentally unfair." *Darden v. Wainwright,* 477 U.S. 168, 181–83, 106 S.Ct. 2464, 2471–72, 91 L.Ed.2d 144 (1986); *Drayden v. White,* 232

F.3d 704, 713 (9th Cir.2000), *cert. denied,* 532 U.S. 984, 121 S.Ct. 1630, 149 L.Ed.2d 491 (2001). "[A] conviction obtained by the [prosecutor's] knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976) (footnotes omitted); *Giglio v. United States,* 405 U.S. 150, 153, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Miller v. Pate,* 386 U.S. 1, 7, 87 S.Ct. 785, 788, 17 L.Ed.2d 690 (1967); *Hayes v. Woodford,* 301 F.3d 1054, 1072 (9th Cir.2002). "To prevail on a claim based on [the prosecutor's knowing use of false evidence], the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material." *United States v. Zuno–Arce,* 339 F.3d 886, 889–90 (9th Cir.2003).

■ Assuming arguendo that the audiotape was mistranscribed, as petitioner claims, petitioner has presented absolutely no competent evidence showing the prosecutor knew, or reasonably should have known, of this error or that she sought to conceal the alleged error from the defense. To the contrary, the audiotaped telephone conversation was played for the jury and both the audiotape and the transcript of the conversation were admitted into evidence without objection. RT 807:19–808:8, 810:3–28, 1480:9–18. Moreover, petitioner concedes that portions of the audiotape are difficult to hear. McElvain Decl., ¶ 15.

■ Nevertheless, even absent intentional misconduct, "[a] conviction based on false evidence warrants a new trial 'if there is a reasonable probability that the result of the proceeding would have been different.'" *Spivey v. Rocha,* 194 F.3d

971, 979 (9th Cir.1999) (citations omitted), *cert. denied,* 531 U.S. 995, 121 S.Ct. 488, 148 L.Ed.2d 461 (2000); *Killian v. Poole,* 282 F.3d 1204, 1208 (9th Cir.2002), *cert. denied,* —— U.S. ——, 123 S.Ct. 992, 154 L.Ed.2d 927 (2003). There is no such possibility here. To the contrary, the disputed version of the conversation, wherein petitioner admits raping the victim, is supported by other, unchallenged parts of the same recorded conversation in which petitioner also admits raping the victim, saying: *"I'm sorry for ever forcing myself on you,* ... in any way." CT 206–08 (emphasis added). Additionally, in yet another unchallenged portion of the recorded conversation, the following exchange occurs:

[Victim]: Whose the one that [sic] lied when we were in court and that you said that ...

[Petitioner]: I did lie.

[Victim]: [y]ou'd never sexually assaulted me. . . .

CT 177. Petitioner never denied the victim's accusation, and a reasonable juror could infer from petitioner's silence that he had lied about not sexually assaulting the victim. *See* CT 328; RT 1492:15–1493:9 (setting forth CALJIC 2.71.5 regarding adoptive admissions); Cal. Evid.Code § 1221; *People v. Mayfield,* 14 Cal.4th 668, 741, 60 Cal.Rptr.2d 1, 42, 928 P.2d 485 (1997), *cert. denied sub nom., Mayfield v. California,* 522 U.S. 839, 118 S.Ct. 116, 139 L.Ed.2d 68 (1997). Thus, the victim's version of the events surrounding her rape by petitioner was corroborated by the undisputed parts of the audiotaped conversation cited above, RT 673:2–695:18, and these parts, as well as the victim's testimony, show that even if the conversation was mistranscribed, as petitioner claims, such error had no effect on petitioner's rape conviction.

█ Therefore, the California Supreme Court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law.

## VI

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const., amend. VI. "[T]he 'core purpose' of the counsel guarantee is to assure aid at trial, 'when the accused [is] confronted with both the intricacies of the law and the advocacy of the public prosecutor.'" *United States v. Gouveia,* 467 U.S. 180, 189–90, 104 S.Ct. 2292, 2298, 81 L.Ed.2d 146 (1984) (quoting *United States v. Ash,* 413 U.S. 300, 309, 93 S.Ct. 2568, 2573, 37 L.Ed.2d 619 (1973)); *Maine v. Moulton,* 474 U.S. 159, 168–69, 106 S.Ct. 477, 483, 88 L.Ed.2d 481 (1985).

█ "The Sixth Amendment right [to counsel] ... does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Texas v. Cobb,* 532 U.S. 162, 167–68, 121 S.Ct. 1335, 1340, 149 L.Ed.2d 321 (2001) (citations and internal quotation marks omitted); *McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991); *Kirby v. Illinois,* 406 U.S. 682, 688, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411 (1972). Thus, the right to counsel attaches only when "the government has committed itself to prosecute, [for it is] only then that the adverse positions of government and defendant have solidified." *Kirby,* 406 U.S. at 689, 92 S.Ct. at 1882; *United States v. Wade,* 388 U.S. 218, 226–27, 87 S.Ct. 1926, 1931–32, 18 L.Ed.2d 1149 (1967). Neither the issuance of an arrest warrant, *Gouveia,* 467 U.S. at 190, 104 S.Ct. at 2298; *United States v. Pace,* 833 F.2d 1307, 1312 (9th Cir.1987), *cert. de-*

*nied,* 486 U.S. 1011, 108 S.Ct. 1742, 100 L.Ed.2d 205 (1988), nor an ongoing attorney-client relationship triggers a Sixth Amendment right to counsel. *Moran,* 475 U.S. at 429–30 & n. 3, 106 S.Ct. at 1145–46 & n. 3. Furthermore, the Sixth Amendment right to counsel is offense specific, with no "exception for crimes that are 'factually related' to a charged offense." *Cobb,* 532 U.S. at 168, 121 S.Ct. at 1340–41.[3] As to those "other crimes, as to which the Sixth Amendment right has not yet attached, [incriminating statements] are, of course, admissible at a trial on those offenses." *Moulton,* 474 U.S. at 180 n. 16, 106 S.Ct. at 489 n. 16; *McNeil,* 501 U.S. at 176, 111 S.Ct. at 2208.

■ In Ground Two, petitioner claims the police violated his Sixth Amendment rights by urging the victim to telephone him and to record her conversation with him since, at the time the telephone call was made, petitioner was represented by counsel in a Municipal Court criminal case in which he was charged with violating a restraining order obtained by the victim, making annoying telephone calls to the victim and attempting to dissuade the victim from testifying against him.

The facts underlying this claim are, as follows: On September 2, 1997, in Los Angeles Municipal Court case no. 7SB07948 ("McElvain I"), a criminal complaint was filed charging that petitioner, on or about July 16, 1997, violated the victim's restraining order, making a telephone call with intent to annoy, and intimidating a witness (the victim). CT 465. On September 16, 1997, criminal defense attorney Steven Lamb appeared on petition-

er's behalf. *Id.;* Declaration of Steven Lamb ("Lamb Decl."), ¶ 2. On September 29, 1997, petitioner pleaded nolo contendere to, and was convicted of, one count of violating a restraining order in violation of P.C. § 273.6(a), and was sentenced to two years probation and fined $910.00. CT 466; Lamb Decl., ¶ 2.

On September 10, 1997, in Los Angeles Municipal Court case no. 7SB08244 ("McElvain II"), petitioner was charged with violating the victim's restraining order on August 13, 1997. CT 469. On September 16, 1997, Lamb also appeared on petitioner's behalf. *Id.* On September 29, 1997, petitioner pleaded nolo contendere to, and was convicted of, one count of violating a restraining order in violation of P.C. § 273.6(a), and was sentenced to two years probation and fined $910.00. CT 470.

On October 23, 1997, the victim initiated the tape-recorded telephone call to petitioner at the request of Sergeant Allen Tucker of the Torrance Police Department. CT 175–210; RT 808:12–809:23, 1118:16–1119:4. On November 26, 1997, a preliminary hearing was held in Los Angeles County Superior Court case no. YA034875 ("McElvain III") (the proceeding challenged herein), CT 1–95, and, on December 10, 1997, petitioner was arraigned and an information was filed charging petitioner with the offenses set forth in Part I above. CT 96–101, 103.

Based on the foregoing facts, it is clear that no charges were pending against petitioner in McElvain III when the tape-recorded conversation took place; thus,

---

**3.** However, "when the Sixth Amendment right to counsel attaches, it does encompass offenses that, even if not formally charged, would be considered the same offense under the *Blockburger* test." *Cobb,* 532 U.S. at 173, 121 S.Ct. at 1343. Under Blockburger, "where the same act or transaction consti-

tutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932).

petitioner's Sixth Amendment right to counsel was not violated. None of the offenses charged in McElvain III can be considered the same offenses charged in McElvain I or McElvain II, *Cobb,* 532 U.S. at 174, 121 S.Ct. at 1335; *see also* P.C. §§ 136.1(a), 236, 245(a)(1), 261(a)(2), 273.5(a), 273.6(a), 422, 594(a), 646.9(b) and 653m(a); therefore, petitioner's claim that his Sixth Amendment rights were violated is without merit. Moreover, since petitioner had already pleaded guilty in McElvain I and McElvain II, petitioner's Sixth Amendment right to counsel in those cases may have already terminated. *Cf. Cahill v. Rushen,* 678 F.2d 791, 795 (9th Cir.1982) (barring use of confession in second trial when police obtained confession following petitioner's trial and conviction, but before he filed an ultimately successful appeal). Thus, the California Supreme Court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law.

## VII

■ To establish a prima facie claim of ineffective assistance of counsel, a defendant must show his trial counsel's performance was deficient and the deficient performance prejudiced the defense. *Williams v. Taylor,* 529 U.S. 362, 390, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000); *Roe v. Flores–Ortega,* 528 U.S. 470, 476– 77, 120 S.Ct. 1029, 1034, 145 L.Ed.2d 985 (2000); *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The defendant bears the burden of establishing both components. *Williams,* 529 U.S. at 390–91, 120 S.Ct. at 1511–12; *Smith v. Robbins,* 528 U.S. 259, 285–86, 120 S.Ct. 746, 764, 145 L.Ed.2d 756 (2000); *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. "Deficient performance is performance which is objectively unreasonable under prevailing professional norms." *Hughes v. Borg,* 898

F.2d 695, 702 (9th Cir.1990) (citing *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064). Prejudice "focuses on the question whether counsel's deficient performance renders the results of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993); *Williams,* 529 U.S. at 393 n. 17, 120 S.Ct. at 1513 n. 17.

■ In reviewing a trial counsel's performance, this Court will "strongly presume[ ] [that counsel] rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066; *Kimmelman v. Morrison,* 477 U.S. 365, 381, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305 (1986). Only if counsel's acts or omissions, examined within the context of all the surrounding circumstances, were outside the "wide range" of professionally competent assistance, will defendant meet his initial burden. *Kimmelman,* 477 U.S. at 386, 106 S.Ct. at 2588; *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2068.

■ If defendant makes this showing, he must then establish there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 693, 104 S.Ct. at 2067; *Williams,* 529 U.S. at 391, 120 S.Ct. at 1511–12. The errors must not merely undermine confidence in the outcome of the trial, but must result in a proceeding that was fundamentally unfair. *Williams,* 529 U.S. at 393 n. 17, 120 S.Ct. at 1513 n. 17; *Lockhart,* 506 U.S. at 369, 113 S.Ct. at 842–43. However, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies. *See Strickland,*

466 U.S. at 697, 104 S.Ct. at 2069 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, ... that course should be followed."); *Smith,* 528 U.S. at 286 n. 14, 120 S.Ct. at 764 n. 14 (same).

### a. Grounds Three and Seven:

■ An attorney's failure to make a meritless objection or motion does not constitute ineffective assistance of counsel. *Jones v. Smith,* 231 F.3d 1227, 1239 n. 8 (9th Cir.2000); *Boag v. Raines,* 769 F.2d 1341, 1344 (9th Cir.1985), *cert. denied,* 474 U.S. 1085, 106 S.Ct. 860, 88 L.Ed.2d 899 (1986); *see also Ceja v. Stewart,* 97 F.3d 1246, 1253 (9th Cir.1996) (Trial counsel is not ineffective in failing to file a suppression motion "which would have been 'meritless on the facts and the law.' " (citation omitted)), *cert. denied,* 522 U.S. 971, 118 S.Ct. 422, 139 L.Ed.2d 324 (1997); *Rupe v. Wood,* 93 F.3d 1434, 1445 (9th Cir. 1996)("[T]he failure to take a futile action can never be deficient performance."), *cert. denied,* 519 U.S. 1142, 117 S.Ct. 1017, 136 L.Ed.2d 894 (1997). Accordingly, since this Court has determined that the transcript of petitioner's telephone conversation with the victim was not "false," and, even if "false," its admission into evidence did not violate either petitioner's Sixth Amendment right to a fair trial (since the prosecutor did not knowingly present false evidence) or his right to counsel, petitioner cannot show deficient performance by his trial counsel for failing to move to suppress the transcript of the conversation.

### b. Ground Four:

■ "[A] defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense." *Rock v. Arkansas,* 483 U.S. 44, 49, 107 S.Ct. 2704, 2708, 97 L.Ed.2d 37 (1987); *Gill v. Ayers,* 322 F.3d 678, 686

(9th Cir.2003). This right has its sources in several constitutional provisions, including the Fourteenth Amendment's due process clause, the Sixth Amendment's compulsory process clause, and as a "necessary corollary to the Fifth Amendment's guarantee against compelled testimony." *Rock,* 483 U.S. at 51–52, 107 S.Ct. at 2708–09; *United States v. Pino–Noriega,* 189 F.3d 1089, 1094 (9th Cir.), *cert. denied,* 528 U.S. 989, 120 S.Ct. 453, 145 L.Ed.2d 369 (1999). "The right is personal, and 'may only be relinquished by the defendant, and the defendant's relinquishment of the right must be knowing and intentional.' " *Pino–Noriega,* 189 F.3d at 1094 (quoting *United States v. Joelson,* 7 F.3d 174, 177 (9th Cir.), *cert. denied,* 510 U.S. 1019, 114 S.Ct. 620, 126 L.Ed.2d 584 (1993)).

■ However, "waiver of the right to testify ... need not be explicit." *Pino–Noriega,* 189 F.3d at 1094; *Joelson,* 7 F.3d at 177. Rather, "waiver of the right to testify may be inferred from the defendant's conduct and is presumed from the defendant's failure to testify or notify the court of his desire to do so." *Joelson,* 7 F.3d at 177; *Pino–Noriega,* 189 F.3d at 1095. "When a defendant remains 'silent in the face of his attorney's decision not to call him as a witness,' he waives the right to testify," *Pino–Noriega,* 189 F.3d at 1095 (citation omitted), and to claim ineffective assistance of counsel due to his counsel's failure to call him as a witness. *United States v. Nohara,* 3 F.3d 1239, 1244 (9th Cir.1993).

■ Here, when trial counsel rested the defense without calling petitioner as a witness, RT 280:14–16, 1378:23–27, petitioner remained silent, and did not insist on testifying in his own defense or otherwise advise the trial court he disagreed with his trial counsel's decision. RT

1378:23–27.[4] Nevertheless, shortly after the jury verdict, petitioner filed a motion for a new trial, claiming in an unsigned declaration: "I wanted to testify in my own defense. I was surprised and didn't know what to do when my attorney stated that the defense rested. I was expecting to testify." CT 497. Defense counsel also stated that he "fail[ed] to obtain a waiver from my client of his right to testify." CT 501. The trial court found these statements were not credible, and, based on that finding, the California Court of Appeal denied petitioner's ineffective assistance of counsel claim, holding:

> [Petitioner] had spoken up several times during trial and post-trial proceedings. The record makes it plain to us that the trial court simply refused to believe the factual allegations supporting the new trial motion. [Petitioner] throughout assumed an aggressive posture and then tried to persuade the trial court that he was at a loss for words when his lawyer rested. Having rejected [petitioner's] and counsel's factual assertions, the trial court had no basis on which to order a new trial motion.

Answer, Exh. A at 30–31 (footnote omitted).

Since petitioner remained silent when his trial counsel rested the defense without calling him as a witness, he has waived his right to testify, *Pino–Noriega*, 189 F.3d at 1095, and cannot now claim ineffective assistance of counsel due to his trial counsel's failure to call him as a witness. *Nohara*, 3 F.3d at 1244.

### c. Ground Five:

■■■ Under California law, "[r]ape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, under any of the following circumstances: ... [w]here it is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." P.C. § 261(a)(2). "Any sexual penetration, however slight, suffices to complete the crime" of rape. P.C. § 263; *People v. Roundtree*, 77 Cal. App.4th 846, 852, 91 Cal.Rptr.2d 921 (2000); *see also People v. Karsai*, 131 Cal. App.3d 224, 232, 182 Cal.Rptr. 406 (1982) ("The penetration which is required is sexual penetration and not vaginal penetration. Penetration of the external genital organs is sufficient to constitute sexual penetration and to complete the crime of rape even if the rapist does not thereafter succeed in penetrating into the vagina."), *disapproved of on other grounds, People v. Jones*, 46 Cal.3d 585, 250 Cal.Rptr. 635, 758 P.2d 1165 (1988). However, impotency may be a defense to rape. *Jones v. Superior Court*, 58 Cal.2d 56, 61, 22 Cal.Rptr. 879, 882, 372 P.2d 919 (1962); *see also People v. Deatrick*, 30 Cal.App. 507, 512, 159 P. 175 (1916) (whether defendant "was impotent and utterly incapable of performing the act with which he was charged" is a jury question).

---

**4.** As the California Court of Appeal found, petitioner was not reluctant to speak up in court when something occurred that was not to his liking. For instance, following his conviction, petitioner commented three times: "She's laughing, your honor," and told an unidentified person "You got [sic] a whore for a granddaughter." RT 1659:11–20. Similarly, at his sentencing, petitioner had no problem expressing himself about the outcome of the trial, stating, "I want to tell, your honor, I never raped [the victim].... She is nothing but a liar, has been caught several times. I like [sic] to know why I am being sentenced for something I didn't do. I think this is wrong. I think this is bullshit," RT 1665:25–1666:6, "full of shit," RT 1668:13, "Your honor, I didn't do the crimes," RT 1668:25, "How can you do this?" RT 1669:6, and concluding, in his own inimical fashion, by telling the trial judge, "Fuck you." RT 1670:14.

 In Ground Five, petitioner claims his trial counsel was ineffective for failing to present evidence that, due to petitioner's diabetes and the medication he was taking for it, petitioner was physically incapable of committing rape. *See* McElvain Decl., ¶ 8; *see also* McElvain Decl., ¶ 19 (stating petitioner told trial counsel that "because of my diabetes, I could not get an erection without considerable help from [the victim]").[5] To support this claim, petitioner presents his declaration and the declaration of Peter Galier, M.D., who treated petitioner for "severe insulin dependent diabetes" and prescribed Elavil for him. Declaration of Peter C. Galier ("Galier Decl."), ¶ 3. Dr. Galier states in his declaration that diabetes can make males impotent, that individuals who have had insulin-dependent diabetes for as long as petitioner "would eventually experience an adverse neurovascular problem[,]" which could include impotence, and that impotence is a noted side effect of Elavil. Galier Decl., ¶¶ 4–6.

The declarations of petitioner and Dr. Galier, however, do not show that petitioner was physically incapable of committing rape, as described by the victim. *Cf. Foster v. Lockhart*, 9 F.3d 722, 726–27 (8th Cir.1993). Indeed, notably absent from petitioner's declaration is any statement that he was physically unable to penetrate the victim on the date of the rape. Nor does Dr. Galier opine that petitioner's diabetes or its medication made him physically unable to achieve an erection or penetrate the victim. To the contrary, a reasonable inference may be drawn from these declarations that, although petitioner was taking Elavil during most of his relationship with the victim, petitioner was still able to have sexual intercourse with her.[6] *See* McElvain Decl., ¶¶ 3, 5, 11, 13. In light of these facts, petitioner has not shown his trial counsel was ineffective for failing to present evidence of petitioner's dubious impotency claim. *See Alexander v. Armontrout*, 985 F.2d 976, 979 (8th Cir.) (trial counsel was not ineffective for failing to introduce medical records showing defendant had been prescribed medication that can potentially cause impotency, but did not show defendant was impotent when he committed rape), *cert. denied*, 510 U.S. 881, 114 S.Ct. 224, 126 L.Ed.2d 180 (1993).

**d. Ground Six:**

 Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066; *Turner v. Duncan*, 158 F.3d 449, 456 (9th Cir.1998). This includes a duty to investigate the prosecution's case and to follow up on any exculpatory evidence. *Morrison*, 477 U.S. at 385, 106 S.Ct. at 2588; *United States v. Tucker*, 716 F.2d 576, 583 n. 16 (9th Cir.1983). Thus, a lawyer's performance is deficient if evidence exists that might show a defendant's innocence or raise sufficient doubt to undermine confidence in a guilty verdict, and the lawyer did not investigate the evidence. *Lord v. Wood*, 184 F.3d 1083, 1093 (9th Cir.1999), *cert. denied sub nom., Lambert v. Lord*,

---

**5.** To the extent petitioner's ineffective assistance of counsel claim relies on trial counsel's failure to call him as a witness regarding his impotency, it fails for the reasons set forth above.

**6.** The victim testified she first met petitioner at the end of June 1996, dated him until August 1996, then got back together with him in December 1996; they became engaged on December 25, 1996; the victim moved in with petitioner in mid-February 1997; and the relationship ended in July 1997, following the rape. RT 615:27–639:10, 847:10–849:13, 876:22–25.

528 U.S. 1198, 120 S.Ct. 1262, 146 L.Ed.2d 118 (2000); *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir.), *cert. denied*, 528 U.S. 929, 120 S.Ct. 326, 145 L.Ed.2d 254 (1999). To show prejudice, petitioner must demonstrate that further investigation would have revealed favorable evidence. *Ceja*, 97 F.3d at 1255; *Hendricks v. Calderon*, 70 F.3d 1032, 1042 (9th Cir.1995). However, " '[a] claim of failure to interview a witness ... cannot establish ineffective assistance when the person's account is otherwise fairly known to defense counsel.' " *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001) (citation omitted), *as amended*, 253 F.3d 1150 (9th Cir.2001); *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986).

In Ground Six, petitioner claims his trial counsel was ineffective for failing to interview or call to testify the following witnesses whom petitioner claims would have impeached the victim: Stacy Carter, who petitioner claims could have testified it was the **victim's** idea to make a videotape of petitioner and her having sex, Memorandum at 26:1–9; Rick Fribaurg,[7] Carlotta Guy,[8] Johanna Hackett,[9] and Dauv McNee-ly,[10] all of who petitioner claims could have testified the victim repeatedly saw petitioner after the restraining order was issued, Memorandum at 26:10–27:7; petitioner's mother, Barbara McElvain, whom petitioner claims could have testified the victim had a motive to testify falsely against petitioner (*see* Second Declaration of Barbara McElvain, ¶ 5) ("I was present at [petitioner's] apartment on July 16, 1997 when [the victim] moved out. I did not hear her say anything about being raped or abused. However, I did hear her tell [petitioner] that she would 'get even' with him for kicking her out of his apartment. While [the victim] was packing her belongings, she told [petitioner]: 'I'm going to make you so sorry you'll wish you were dead.' "); and Kenneth Zunker, David Groves, Dorothy Seele, and Jennifer McManus, all of whom petitioner claims could have testified that "[the victim] was seen with Petitioner numerous times at his apartment and at restaurants after the restraining order had been issued and on all of these occasions appeared comfortable and friendly with the Petitioner." Memorandum at 28:1–5.[11]

---

7. Rick Fribaurg, a friend of petitioner's, who would have testified he saw the victim at petitioner's apartment on two or three times after the restraining order was issued, and saw petitioner and the victim at Scoop's ice cream shop after the issuance of the restraining order. Fribaurg Decl., ¶ 3. Fribaurg would also have testified that the day after petitioner told Fribaurg the victim obtained a restraining order against him, petitioner received a page from "a telephone number which appeared to be the telephone number of [the victim,]" and petitioner returned the call and said he was going to meet the victim. Fribaurg Decl., ¶ 2

8. Carlotta Guy, one of petitioner's former neighbors, who would have testified she saw the victim at petitioner's apartment on one occasion after the restraining order was issued. Guy Decl., ¶ 6.

9. Johanna Hackett testified at petitioner's first trial and described seeing petitioner with the victim at a restaurant on September 27, 1997. Hackett Decl., ¶ 1. Petitioner's earlier trial ended in a mistrial when petitioner was unable to participate in his own defense because he did not receive required medication. *See*, e.g., RT 1:18–8:4.

10. Dauv McNeely, a friend of petitioner's, who would have testified he saw the victim at petitioner's apartment "[o]n at least 10 occasions after [petitioner] informed him about the restraining order," sometimes arguing with petitioner and on other occasions "kicking back" on petitioner's couch. McNeely Decl., ¶ 2.

11. Petitioner offers no evidence his trial counsel was aware of witnesses Zunker, Groves, Seele and McManus, or their proposed testimony, and his cursory and speculative state-

This claim must be considered in light of all the evidence presented at trial. First, at trial, the victim acknowledged that after the restraining order was issued, she met petitioner three times. RT 757:16–770:13. Second, petitioner's neighbors, Michael and Lynn Miller, testified they saw petitioner and the victim at petitioner's apartment "getting along just fine" on at least "half a dozen" occasions after the restraining order was issued. RT 1331:17–1335:28, 1352:12–1355:28, 1365:6–1367:8. Indeed, the Millers testified that after the restraining order was issued, they heard what they believed to be petitioner and the victim having sex in petitioner's apartment. RT 1359:6–1360:4, 1360:25–1361:21, 1367:9–1368:18. Third, Cindy Lou Langley testified she saw petitioner and the victim together on two occasions in September 1997, after the restraining order was in effect. RT 1244:16–1249:7, 1270:26–1272:18. Langley further testified that between September and October 1997, she saw the victim at petitioner's home once or twice a week, sometimes in the morning "leaving the residence, getting into her car[,]" and on other occasions "parking her car in the parking area [and] walking into the apartment." RT 1253:6–27, RT 1272:25–1273:12, 1273:24–1274:7. Fourth, Deseree Burjakawsky testified she saw the victim walking to the door of petitioner's home in mid-October 1997. RT 1290:16–1291:8, 1295:16–1296:11.

As an initial matter, petitioner concedes he informed his trial counsel of the substance of Carter's testimony before trial; therefore, trial counsel was not deficient for failing to interview Carter. *Bragg,* 242

F.3d at 1088. Rather, trial counsel made a reasonable tactical decision not to call Carter as a witness. *See* First Declaration of Barbara McElvain, ¶ 3. Similarly, trial counsel was aware of Mrs. McElvain's testimony before petitioner's first trial, Second Declaration of Barbara McElvain, ¶ 6; thus, trial counsel was not deficient for failing to interview Mrs. McElvain. *Bragg,* 242 F.3d at 1088.

Regarding Carter's testimony, and assuming the videotape was originally made with the victim's consent, that evidence would not rebut the victim's claim that petitioner threatened to blackmail her with the videotape, or that the victim went to petitioner's apartment to retrieve the videotape after their relationship ended. *See* RT 656:21–660:6. Thus, at best, Carter's testimony would have impeached the victim regarding only a collateral matter. Moreover, if Carter's testimony had been presented by the defense, it could have been rebutted by Tara Kinsey, who would have testified petitioner and Carter discussed videotaping petitioner having sex with the victim without her knowledge, that petitioner showed her a videocamera he had secreted in his closet for that purpose, and that when she confronted petitioner about his plan and said it was "pretty sick," petitioner just laughed. RT 144:15–147:9.[12]

As it was, the victim's testimony that she was unaware she had been videotaped was corroborated by Michael Miller, who testified petitioner told him he (petitioner) had secretly recorded himself having sex with the victim. RT 1360:8–24. For this

ments about these witnesses' proposed testimony is manifestly insufficient to state an ineffective assistance of counsel claim. *See Bragg,* 242 F.3d at 1088 (mere speculation witness might have given helpful information if interviewed is not enough to establish ineffective assistance).

12. Kinsey testified out of the presence of the jury during a hearing under California Evidence Code § 402 to determine the videotape's admissibility. RT 142:8–161:13.

reason, and the reasons discussed above, petitioner was not prejudiced by his counsel's refusal to call Carter as a witness since, "even if the impeachment evidence had been presented to the jury, there is no reasonable probability that the outcome of the trial would have been different." *United States v. Holmes*, 229 F.3d 782, 789–90 (9th Cir.2000), *cert. denied*, 531 U.S. 1175, 121 S.Ct. 1148, 148 L.Ed.2d 1011 (2001). Likewise, in light of Mrs. McElvain's relationship to her son, and her obvious bias in his favor, even if her evidence had been presented to the jury, there is no reasonable probability the outcome of the trial would have been different. *Id.*

■ Finally, in light of the substantial evidence showing an ongoing relationship between petitioner and the victim even after the victim obtained the restraining order against petitioner, the additional testimony of Fribaurg and the others would have been cumulative, and petitioner's counsel's decision to not call these witnesses was not deficient performance. *Turner v. Calderon*, 281 F.3d 851, 875 (9th Cir.2002); *United States v. Schaflander*, 743 F.2d 714, 718 (9th Cir.1984), *cert. denied*, 470 U.S. 1058, 105 S.Ct. 1772, 84 L.Ed.2d 832 (1985).[13]

Further, petitioner claims his trial counsel was ineffective for not subpoenaing the victim's school records to show when her biology class ended because:

> [The victim] had testified that her ankle was injured the night of the alleged rape—July 13/14, 1997[,] ... and Ms. Neely [testified she was at the victim's apartment, and the victim had an injured ankle,] prior to the submission of their biology project, the date of which she was unable to recall with certainty.... If the due date was any time **prior to July 14,** that information would have shown that [the victim's] allegations concerning the rape were false and impossible, given her school schedule and Ms. Neely's testimony.

Memorandum at 27:12–22 (emphasis added). There is no merit to this claim since the victim and Ms. Neely "presented their class project together, on July 16, 1997." Declaration of Stephen Leonelli, ¶¶ 2–4.

■ Finally, petitioner's claims that trial counsel was ineffective in cross-examining the victim, Memorandum at 28:7–16, are without merit. Rather, counsel extensively cross-examined the victim about an incident on July 4, 1997, RT 856:4–860:8, 986:25–987:21, and made a reasonable tactical decision not to use the victim's love letters to petitioner to cross-examine her.

---

13. Petitioner has provided no factual support for his claim trial counsel was ineffective for failing to transcribe tapes allegedly in police possession which "would have demonstrated [the victim's] continued desire to reach out and contact Petitioner after the restraining order was in place." Memorandum at 27:23–28:1. Thus, this claim is "conclusory" and "falls far short of stating a valid claim of constitutional violation." *Jones v. Gomez*, 66 F.3d 199, 205 (9th Cir.1995), *cert. denied*, 517 U.S. 1143, 116 S.Ct. 1437, 134 L.Ed.2d 559 (1996); *James v. Borg*, 24 F.3d 20, 26 (9th Cir.), *cert. denied*, 513 U.S. 935, 115 S.Ct. 333, 130 L.Ed.2d 291 (1994). Moreover, as discussed above, such evidence would have been cumulative.

Petitioner also argues the testimony of Carter, Fribaurg and Guy could have rebutted the testimony of the victim's grandmother that the victim wore long-sleeved clothing to cover the bruises petitioner inflicted on her. RT 298:18–300:27; Carter Decl., ¶ 12; Fribaurg Decl., ¶ 5; Guy Decl., ¶ 4. However, the testimony of Carter, Fribaurg, and Guy on this point is not necessarily inconsistent with the victim's grandmother's testimony—for instance, Carter merely states he did not see any bruises on the victim's body when he visited petitioner in January 1997. Therefore, petitioner's trial counsel was not ineffective in electing not to present this testimony.

Those letters, some of which are undated and others of which are dated before February 1997, had little relevance to petitioner's defense—and could have had a very prejudicial or negative effect on the jury. In any event, even if this evidence had been presented to the jury, there is no reasonable probability the outcome of the trial would have been different. *Holmes,* 229 F.3d at 789–90.

### e. Ground Eight:

■■■ The Fourteenth Amendment requires the suppression of statements obtained by "techniques and methods offensive to due process." *Haynes v. Washington,* 373 U.S. 503, 515, 83 S.Ct. 1336, 1344, 10 L.Ed.2d 513 (1963); *Clark v. Murphy,* 331 F.3d 1062, 1072 (9th Cir. 2003). "To be admissible, a suspect's statement must be voluntary, and in determining whether a statement was voluntary, the question is 'whether the defendant's will was overborne at the time he confessed.'" *Clark,* 331 F.3d at 1072 (quoting *Haynes,* 373 U.S. at 513, 83 S.Ct. at 1343). "Under the Fourteenth Amendment, a confession is involuntary only if the police use coercive means to undermine the suspect's ability to exercise his free will." *Pollard v. Galaza,* 290 F.3d 1030, 1033 (9th Cir.), *cert. denied,* 537 U.S. 981, 123 S.Ct. 449, 154 L.Ed.2d 343 (2002).

"In determining whether a statement is voluntary, the court looks at the surrounding circumstances and the combined effect of the entire course of the officer's conduct upon the defendant." *Pollard,* 290 F.3d at 1033; *Henry v. Kernan,* 197 F.3d 1021, 1026 (9th Cir.1999), *cert. denied,* 528 U.S.

1198, 120 S.Ct. 1262, 146 L.Ed.2d 117 (2000); *Amaya–Ruiz v. Stewart,* 121 F.3d 486, 494 (9th Cir.1997), *cert. denied,* 522 U.S. 1130, 118 S.Ct. 1083, 140 L.Ed.2d 140 (1998). However, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986). "The most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause." *Id.* at 166, 107 S.Ct. at 521.

In Ground Eight, petitioner claims his trial counsel was deficient because he failed to move to suppress the audiotape of the conversation between petitioner and the victim on the ground it was coerced and involuntary. SAP at Addendum; Memorandum at 30:6–31:25.[14]

■■■ As an initial matter, statements are not considered to be coerced or involuntary merely because the speaker is unaware that his statements are being recorded. *Procunier v. Atchley,* 400 U.S. 446, 454, 91 S.Ct. 485, 489, 27 L.Ed.2d 524 (1971); *United States v. Keen,* 508 F.2d 986, 989 (9th Cir.1974), *cert. denied,* 421 U.S. 929, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975); *Williams v. Nelson,* 457 F.2d 376, 377 (9th Cir.1972) (per curiam). Nevertheless, petitioner claims his "will to resist confessing was overborne by [the victim's] false representations that if he made the admissions she wanted him to make they could 'get back together,' and that his

---

**14.** Although petitioner cites both the Fifth and Fourteenth Amendments, his claims are properly analyzed under the Fourteenth Amendment's due process clause. *See Miller v. Fenton,* 474 U.S. 104, 110, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985) ("[E]ven after holding

that the Fifth Amendment privilege against self-incrimination applies in the context of custodial interrogations, and is binding on the States, the Court has continued to measure confessions against the requirements of due process." (citations omitted)).

statements would not be used to have him arrested." Memorandum at 30:15–17.[15]

There is no merit to this claim, as found by the California Court of Appeal:

> The victim used guile, not coercion. Nothing in the law prevents the use of a statement wheedled out of a batterer by the victim, even if the police are listening in and recording. Deception does not necessarily involve coercion. The evidence strongly supported the jury's findings that [petitioner], over an extended period of time, brutally abused and tormented the victim. To turn the entire situation upside-down and find that during a telephone conversation *she* coerced words out of *him* would be to abandon all sense of perspective. We shall not succumb. [¶] Any objection by trial counsel would have been futile.

Answer, Exh. A at 29 (emphasis in original).

The totality of the circumstances shows that petitioner's statements to the victim were the "product of a rational intellect and free will." *Mincey v. Arizona*, 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978) (citations and internal quotation marks omitted); *Shackleford v. Hubbard*, 234 F.3d 1072, 1080 (9th Cir. 2000), *cert. denied*, 534 U.S. 944, 122 S.Ct. 324, 151 L.Ed.2d 242 (2001). Here, petitioner, who was not in custody when the victim telephoned him, was not required to talk to the victim and was free to hang up the telephone at any time. *See People v. Ragen*, 262 Cal.App.2d 392, 398, 68 Cal. Rptr. 700 (1968) (police conduct in having rape victim telephone perpetrator and accuse him of crime did not overbear perpetrator's will to resist where he could have hung up at any time), *cert. denied sub nom., Ragen v. California*, 393 U.S. 1000, 89 S.Ct. 489, 21 L.Ed.2d 465 (1968).

Moreover, the victim's requests to petitioner to tell the truth, to be honest with her, and to say what really happened were not sufficient to overbear petitioner's will. *Amaya–Ruiz*, 121 F.3d at 486. Finally, although the victim assured petitioner their conversation was not being recorded, petitioner was well aware that might not be true and his statements could be used against him. *See*, e.g., CT 179 ("[Y]ou can record this if you want and use it against me, I don't care."), 180 ("So there's one thing if somebody wanted to record some of my phone calls. I did go to your school."), 186 ("I'm not going to, I'm not going to say it over the phone because I, I feel like after all that has gone on and I get a phone call today? What is happening here? Am I going to get ready to get really rigorously fucking screwed?"), 188 ("In fact, if you want to talk to me in public, or, or somewhere. I will, I will, I will confess everything to you that I did. But I will not do it over a phone. I will not."), 189–90 ("I told her everything.... And I'm not going to say it on the phone again 'cause you already know. You know what I've done and I know what I've done. I'm not talking on the phone about it 'cause I don't feel like I, I, I don't feel like right now I can trust you on the phone."), 192 ("I'm not saying nothing to you on the phone.... I don't want to be recorded by Detective fucking Gayda, by your work, by anybody."). Since petitioner's statements in the tape-recorded conversation were not coerced, petitioner cannot show his attorney's performance was deficient in failing to file a suppression motion of the audiotape.

#### f. Ground Twelve:

In Ground Twelve, petitioner claims his trial counsel was deficient for repeatedly

---

**15.** Petitioner has presented absolutely no evidence showing his statements to the victim were in response to any suggestion they might begin seeing each other again. *United States v. Weekley*, 130 F.3d 747, 751–52 (6th Cir. 1997).

failing to object to the admission of improper bad character evidence and failing to request a limiting instruction regarding the expert testimony on the battered women's syndrome. SAP at Addendum; Memorandum at 39:6–40:4.

Contrary to petitioner's claims, petitioner's trial counsel **did** object to certain of the evidence petitioner now claims he failed to object to, *see,* e.g., RT 745:23–28, 1178:7–11, and the trial court did **give** the standard limiting instruction regarding the expert testimony about the battered women's syndrome. RT 1497:8–1498:3, CT 335. Therefore, petitioner cannot show any factual bases for these claims.

The California Supreme Court's denial of all of these ineffective assistance of counsel claims was neither contrary to, nor an unreasonable application of, clearly established federal law.

### VIII

■ Under narrow circumstances, the misapplication of state evidentiary rules may violate federal due process safeguards. *Lewis v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990); *Ortiz v. Stewart,* 149 F.3d 923, 941 (9th Cir.1998), *cert. denied,* 526 U.S. 1123, 119 S.Ct. 1777, 143 L.Ed.2d 806 (1999). However, to warrant federal habeas relief, a state court's evidentiary ruling must have "so fatally infected the proceedings as to render them fundamentally unfair." *Dubria v. Smith,* 224 F.3d 995, 1001 (9th Cir.2000) (en banc), *cert. denied,* 531 U.S. 1148, 121 S.Ct. 1089, 148 L.Ed.2d 963 (2001); *Dillard v. Roe,* 244 F.3d 758, 766 (9th Cir.), *cert. denied,* 534 U.S. 905, 122 S.Ct. 238, 151 L.Ed.2d 172 (2001). In the context of a claim of improperly-admitted evidence, "[a] writ of habeas corpus will be granted ... only where the 'testimony is almost entirely unreliable and ... the factfinder and the adversary system will not

be competent to uncover, recognize, and take due account of its shortcomings.'" *Mancuso v. Olivarez,* 292 F.3d 939, 956 (9th Cir.2002) (quoting *Barefoot v. Estelle,* 463 U.S. 880, 899, 103 S.Ct. 3383, 3398, 77 L.Ed.2d 1090 (1983)). In other words, "[o]nly if there are *no* permissible inferences the jury could draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'" *Jammal v. Van de Kamp,* 926 F.2d 918, 920 (9th Cir.1991) (emphasis in original; citation omitted); *Windham v. Merkle,* 163 F.3d 1092, 1103 (9th Cir.1998).

#### a. Grounds Nine and Eleven:

In Ground Nine, petitioner claims he was deprived of due process of law when the trial court admitted expert testimony on the battered women's syndrome, SAP at Addendum; Memorandum at 32:5–35:13, and in Ground Eleven, petitioner claims the prosecutor committed misconduct in introducing expert testimony regarding the battered women's syndrome since such evidence was inflammatory. SAP at Addendum; Memorandum at 38:11–26.

Battered women's syndrome "is defined as 'a series of common characteristics that appear in women who are abused physically and psychologically over an extended period of time by the dominant male figure in their lives.'" *Dillard,* 244 F.3d at 763 (quoting *People v. Humphrey,* 13 Cal.4th 1073, 1083–84, 56 Cal.Rptr.2d 142, 148–49, 921 P.2d 1 (1996)). Under California law,

[i]n a criminal action, expert testimony is admissible by either the prosecution or the defense regarding battered women's syndrome, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal

defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge.

Cal. Evid.Code § 1107(a). Furthermore, "[t]he foundation shall be sufficient for admission of this expert testimony if the proponent of the evidence establishes its relevancy and the proper qualifications of the expert witness." Cal. Evid.Code § 1107(b).

At trial, Gail J. Pincus, a licensed clinical social worker and the executive director of a domestic abuse center, testified as an expert witness regarding the battered women's syndrome. RT 1141:14–1178:21. Pincus described in detail the development of battered women's syndrome during a "three-phase cycle": (1) "the tension rising period"; (2) "the actual physical violence"; and (3) the "honeymoon" period. RT 1149:13–1159:25. Pincus testified that "the victim ... does a dance of accommodation around the outside of [the three-phase cycle], and it is this dance that we actually call battered women's syndrome." RT 1159:26–1164:11.

Since petitioner does not challenge Pincus's credentials as an expert witness, RT 1142:3–1144:10, this Court need only consider whether her expert testimony was relevant under California law. There are "two major components to a relevance analysis in this context. First, there must be sufficient evidence in the particular case to support a contention that the syndrome applies to the woman involved. Second, there must be a contested issue as to which the syndrome testimony is probative." *People v. Gadlin,* 78 Cal.App.4th 587, 592, 92 Cal.Rptr.2d 890 (2000).

▆ Here, the victim testified she was frequently psychologically and physically abused by petitioner, starting when she initially tried to end their relationship in August 1996, RT 618:19–619:24, at which time petitioner struck her on the back of her head with his fist, knocking her to the carpet. RT 622:2–624:3. However, the victim declined to press charges regarding this incident. RT 631:1–16. The victim also testified to numerous other incidents of abuse after she and petitioner resumed their relationship in December 1996, especially after she moved in with petitioner in February 1997. RT 617:26–618:18, 635:7–653:13, 851:5–852:24, 639:8–23. For instance, the victim testified that, on one occasion, after she removed her engagement ring and told petitioner she wanted to end their engagement, petitioner grabbed her finger and bent it back to punish her for taking the ring off. RT 640:1–641:6. As a result, the victim's finger was swollen and she was unable to move it for a month, and her finger today remains "one size larger" than before the incident. RT 640:21–28, 642:24–643:2. Nonetheless, several hours after injuring the victim, petitioner attempted to force the victim to wear the ring even though it would not fit over her swollen finger. RT 641:16–642:15. The victim also testified she was physically abused by petitioner "weekly[,] ... whether it would be that he would either hit me or he would try to make me stop talking if I was talking to him," RT 644:8–653:13, and other witnesses observed the victim's injuries. RT 298:18–302:5, 321:7–27, 996:14–22, 997:25–1000:27. Furthermore, in early July 1997, when the victim told petitioner she wanted to leave him, he threatened to send copies of the surreptitiously made sex videotape to the victim's family and friends. RT 655:27–660:6. Finally, the victim testified about the events on July 13–14, 1997, when petitioner raped her, ejaculated on her stomach, "told [her] to place [the semen] in [her] fucking mouth," and, when she refused, called her a "worthless piece of shit," urinated on her, and refused to let her use a restroom to clean herself up.

RT 672:21–695:15. The foregoing testimony by the victim is sufficient to permit evidence of the battered women's syndrome. *People v. Williams*, 78 Cal. App.4th 1118, 1129, 93 Cal.Rptr.2d 356 (2000); *Gadlin*, 78 Cal.App.4th at 593, 92 Cal.Rptr.2d 890.

▮ Further, the victim's credibility was crucial in the criminal case against petitioner, where petitioner's counsel accused the victim of lying [16] and suggested the victim was often the aggressor in disputes between her and petitioner. RT 843:1–972:12, 986:5–988:6. As such, the battered women's syndrome was relevant to explain the victim's behavior in staying in the relationship with petitioner, who was abusing her. *Williams*, 78 Cal.App.4th at 1128, 93 Cal.Rptr.2d 356; *see also Humphrey*, 13 Cal.4th at 1087, 56 Cal.Rptr.2d at 151, 921 P.2d 1 (evidence of battered women's syndrome is relevant to credibility and would help dispel layperson's perception victim was "free" to leave any time). Since there were permissible inferences that could be drawn from the expert witness's testimony regarding the battered women's syndrome, even if the evidence had been improperly admitted, which it was not, its admission did not prevent a fair trial. *Windham*, 163 F.3d at 1103; *Jammal*, 926 F.2d at 920.[17] Moreover, the trial court gave the jury an instruction limiting consideration of the battered women's syndrome explaining the victim's reactions, RT 1497:8–1498:3, CT 335, and the jurors are presumed to follow the instructions. *Aguilar v. Alexander*, 125 F.3d 815, 820 (9th Cir.1997). Therefore, "the admission of [the battered women's syndrome] testimony by the trial court did not 'result

in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Dillard*, 244 F.3d at 767 (quoting 28 U.S.C. § 2254(d)(1)).

For the same reasons, there was no prosecutorial misconduct in presenting expert testimony regarding the battered women's syndrome. *See United States v. Hinton*, 31 F.3d 817, 824 (9th Cir.1994) (prosecutor does not commit misconduct by presenting admissible evidence), *cert. denied*, 513 U.S. 1100, 115 S.Ct. 773, 130 L.Ed.2d 669 (1995).

**b. Ground Ten:**

In Ground Ten, petitioner claims he was deprived of due process of law when the trial court erroneously admitted bad character evidence, SAP at Addendum; Memorandum at 35:18–38:6, and he cites ten instances of evidence he claims was improperly admitted, allegedly prejudicing petitioner's right to a fair trial. SAP at Addendum; Memorandum at 35:18–38:4.

▮ Much of the evidence petitioner objects to was properly admitted at trial. For instance, to the extent petitioner objects to the admission of Pincus's expert testimony regarding the battered women's syndrome, such testimony was properly admitted, as discussed above. Likewise, although petitioner objects to evidence regarding the restraining order, and Officer Dennis Brady's testimony regarding the circumstances of petitioner's August 13, 1997 arrest for violating the restraining order, such testimony and evidence was

---

16. Indeed, counsel's first question to the victim was "Is it your whole testimony is a lie?" RT 843:20–21. The trial court sustained an objection to this question. RT 843:22–23.

17. When, as here, battered women's syndrome evidence "is properly admitted, testimony about the hypothetical [batterer and] victim is needed for the syndrome to be understood." *Gadlin*, 78 Cal.App.4th at 595, 92 Cal.Rptr.2d 890.

relevant to, among other things, the stalking charges against petitioner. *See,* e.g., *People v. Garcia,* 89 Cal.App.4th 1321, 1333–36, 107 Cal.Rptr.2d 889 (2001); *People v. Garrett,* 30 Cal.App.4th 962, 967, 36 Cal.Rptr.2d 33 (1994). Similarly, Neely's testimony corroborated the victim's testimony regarding injuries the victim sustained; and the testimony of Neely, Dr. Les Huey and Joshua Aizenberg about telephone calls they received from petitioner about the victim was relevant to the stalking charges.

 Even if one assumes some of the evidence petitioner complains about was improperly admitted, that evidence was such a minor aspect of the trial that it could not possibly have affected the outcome. For instance, Officer Robert Wylie's testimony that petitioner and his mother made derogatory comments to the victim as she was moving her belongings out of petitioner's apartment following the rape is such a minor detail that it could not possibly have had an impact on the proceedings.[18] Similarly, the prosecutor's questions to petitioner's father about whether petitioner's mother called the victim a "bitch," which petitioner's father **denied**,[19] could not have adversely affected the proceedings. Finally, petitioner could not have been prejudiced by Detective Lara's testimony that petitioner threatened the victim and her family at the time of his arrest,[20] given the other substantial evidence of petitioner's threats to the victim, including petitioner telling the victim: "You're fucking dead," after he was released from custody on August 13, 1997, and threatening the victim with a knife and telling her "he would fucking kill [her]," on October 20, 1997. CT 169; RT 509:24–511:24, 516:17–18, 751:22–752:20, 781:26–782:20. In short, this Court concludes the admission of such evidence, either viewed individually or cumulatively, was not improper, and, even if so, did not "so fatally infect[ ] the proceedings as to render them fundamentally unfair." *Dubria,* 224 F.3d at 1001. Therefore, the California Supreme Court's denial of these claims was neither contrary to, nor an unreasonable application of, clearly established federal law.

## RECOMMENDATION

IT IS RECOMMENDED that the Court issue an Order: (1) approving and adopting this Final Report and Recommendation; (2) adopting the Final Report and Recommendation as the findings of fact and conclusions of law herein; and (3) directing that Judgment be entered denying the petition and dismissing the action with prejudice.

---

**18.** RT 1102:16–1111:20.

**19.** RT 1324:13–15.

**20.** RT 1112:13–1118:2.